# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-DR-02248-SCT

*ROGER ERIC THORSON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/08/2002 |
| TRIAL JUDGE: | HON. JERRY O. TERRY, SR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JIM DAVIS |
| | DANIEL S. BRENNAN |
| | RICHARD F. KLAWITER |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| | JASON L. DAVIS |
| DISTRICT ATTORNEY: | CONO A. CARANNA, II |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | PETITION FOR POST-CONVICTION RELIEF IS DENIED IN PART AND GRANTED IN PART. THIS CASE IS REMANDED TO THE CIRCUIT COURT OF THE SECOND JUDICIAL DISTRICT OF HARRISON COUNTY FOR AN EVIDENTIARY HEARING CONSISTENT WITH *ATKINS, CHASE* AND *LYNCH* - 08/30/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

**STATEMENT OF THE CASE**
**AND PROCEDURAL HISTORY**

¶1.    Roger Eric Thorson was indicted on June 3, 1987, and charged with capital murder of his ex-girlfriend, Gloria McKinney, during the commission of kidnapping on March 4, 1987. Thorson entered a plea of not guilty and proceed to trial in the Second Judicial District of Harrison County on May 16, 1988. Two days into the trial, a break-in occurred in a motel room occupied by two of the sequestered jurors. Thorson moved for a mistrial, which was granted.

¶2.    Venue for the new trial was transferred to Walthall County, and trial began on September 18, 1988, in Tylertown. The jury found Thorson guilty as charged and returned a sentence of death. On appeal, this Court remanded for a *Batson* hearing to determine if the prosecution violated *Batson v. Kentucky*, 476 U.S. 79, 85-86, 106 S. Ct. 1712, 1716-17, 90 L. Ed. 2d 69, 80 (1986) in exercising its peremptory strikes. *Thorson v. State*, 653 So. 2d 876 (Miss. 1994). The circuit court found no *Batson* violation, and Thorson appealed the circuit court's ruling. Upon his second appeal, this Court reversed Thorson's conviction, finding that a juror had been improperly challenged solely for her religious affiliation, and ordered a new trial. *Thorson v. State*, 721 So. 2d 590 (Miss. 1998).

¶3.    Thorson's third trial began June 3, 2002, in the Circuit Court of the Second Judicial District of Harrison County, where he was again found guilty of capital murder and sentenced to death by lethal injection. *Thorson v. State*, 895 So. 2d 85, 94 (Miss. 2004). Thorson raised thirty-three (33) assignments of error on direct appeal, which this Court found

2

to be without merit. We affirmed Thorson's conviction and sentence on November 4, 2004. *Id.* We subsequently denied Thorson's motion for rehearing on February 3, 2005. *Id.* His petition for writ of certiorari to the United States Supreme Court was denied on October 3, 2005. *Thorson v. Mississippi*, ___ U.S. ___, 126 S.Ct. 53, 163 L. Ed. 2d 83 (2005).

¶4.     Thorson now comes before this Court on his Petition for Post-Conviction Relief and his supplemental petition. For the reasons discussed below, we find that this matter should be remanded to the trial court for the sole purpose of conducting a hearing pursuant to *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); *Lynch v. State*, 951 So. 2d 549 (Miss. 2007); and, *Chase v. State*, 873 So. 2d 1013 (Miss. 2004).

## STATEMENT OF THE FACTS

¶5.     The following facts are gleaned from this Court's opinion on Thorson's direct appeal:

On March 4, 1987, Roger Eric Thorson visited Edgewater Mall in Biloxi in order to talk to his former fiancee, Gloria McKinney. He was worried that his neighbor and girlfriend Patricia Cook might have said some things to Gloria, so he wanted to apologize to her in person. When Thorson arrived at the mall, he learned from his friend, Reggie Brazeal, that McKinney would not get off work from Morrison's until 4:00 p.m. However, Thorson remained at the mall until McKinney left at 4:45 p.m. When McKinney exited the mall, Thorson approached her car, told her that he had come to apologize and asked her for a ride to the Cedar Lake exit. When they arrived at the exit, Thorson asked McKinney to keep driving towards his house because he still needed to talk to her. At this time, Thorson pulled a knife on McKinney. McKinney continued to drive at knife point until Thorson directed her to a dirt road. Thorson then ordered McKinney to remove all of her clothes and turn with her back facing him. He then placed a .22 revolver pistol on the dashboard which he had recently purchased from his neighbor, Paul Quinn. After McKinney removed her clothes, Thorson removed a piece of rope from his jacket pocket and tied her hands behind her back. He then placed her brassiere in her mouth and tied it around her neck. Thorson then raped Gloria McKinney. After he raped her, Thorson took a towel that he had found in McKinney's car and wiped down

3

everything that he thought he might have touched because he did not want any of his fingerprints in her car. Thorson asked McKinney if she would tell anyone what had just happened, and she shook her head indicating that she would not. Thorson told her that he did not believe her. He then took the knife and slit her throat. Thorson got out of her car and removed a blue jacket which he had given to Gloria, a plastic power steering fluid bottle and Gloria's wallet. He removed Gloria's driver's license from the wallet because he wanted a picture of her. He threw the bottle and wallet into the woods so it would appear that someone else had hurt Gloria. At this time Gloria was sitting in the car, bleeding from the wound to her neck. She was able to get out of her car and work the brassiere from her mouth. When she screamed for help, Thorson walked back to the car and shot her in the head with the .22 revolver. He then ran home and hung Gloria's coat in his closet. Thorson walked to Patricia Cook's trailer, which was directly behind his, and cleaned his hands and the knife with bleach to remove any traces of blood or gunpowder residue. He then went back to his trailer and wrapped the knife, gun, shells and Gloria's watch in Gloria's jacket and buried it in a vacant lot near his trailer.

Thorson was arrested for the murder of Gloria McKinney on March 8, 1987. On June 3, 1987, Thorson was indicted in the Second Judicial District of Harrison County for the capital murder and felony kidnapping of Gloria McKinney. Trial commenced on June 3, 2002.[1] During the trial the State called several witnesses to testify during its case-in-chief. Reginald Brazeal first testified that at the time of Gloria McKinney's death he was the head chef at the Morrison's located in Edgewater Mall. Brazeal stated that when he left work on March 4, 1987, at approximately 3:30 or 4:00 p.m., Thorson was waiting in the parking lot. Thorson asked Brazeal what time McKinney would be getting off of work, and Brazeal responded that he was not sure. Thorson explained that there were "some things he wanted to get straight with her."

The State also called Rick Gaston who was employed by the Harrison County Sheriff's Department. On March 5, 1987, Gaston was a Captain with the Patrol Division and was Shift Supervisor. Gaston first came in contact with Thorson when he was investigating McKinney's disappearance. Thorson told Gaston that he had not seen McKinney for several months. However, Gaston informed Thorson that he had been seen talking to her at the mall. Thorson explained that he had been there to see the Clydesdale horses and had seen her briefly in

---

[1]As noted in the procedural history of this case, *supra*, this is the date of Thorson's third trial.

the parking lot when she got off of work. Thorson informed [Gaston] that he would be willing to help with the investigation in any way. [Gaston] then drove Thorson to the Central Intelligence Division (CID) where he was introduced to Investigator Jerry Tootle. Once at the CID, Thorson changed his story and told the investigators that McKinney had given him a ride from the mall the previous day. Thorson spent several hours at the CID talking to investigators on the evening of March 5, 1987, before he was returned home. The body of Gloria McKinney was subsequently found on March 7, 1987. After the body was discovered, the investigators visited Thorson's home again. Thorson voluntarily offered to come to the CID. He was not under arrest at this time.

Robert Burriss, employed by the Biloxi Police Department, testified that as a crime scene technician, he was called to the scene where McKinney's body and automobile were discovered. Burriss identified several pictures taken at the scene of the crime which portrayed blood found in the victim's car, the victim with her throat cut and the victim lying in her car. Burriss also identified photographs depicting the victim's hands bound and the victim's mouth gagged with her brassiere. Burriss testified that when he processed the victim's automobile for fingerprints, he was only able to develop streaks which led him to believe the car had been wiped clean.

Next, Richard Giraud, employed by the Harrison County Sheriff's Department, testified that as an investigator at the time of McKinney's murder he was present during the interview of Thorson at the CID on the evening of March 5, 1987. Giraud testified that Thorson continuously changed his story regarding talking to and seeing McKinney the previous day. During the next interview on March 7, 1987, Thorson informed the investigators that he and McKinney had driven past the Cedar Lake exit to a dirt road and had engaged in sexual intercourse. Thorson stated that McKinney then dropped him off at home. Thorson remained at CID until he was arrested at approximately 1:30 a.m. March 8, 1987. Giraud testified that he was arrested due to inconsistencies in his statements. On the morning of March 8, 1987, Giraud received information from Patricia Cook that evidence was buried near Thorson's residence. Giraud testified that the investigators found a gun, a blue jacket, a picture from the victim's driver's license and a knife. After finding these items, Giraud testified that he returned to CID and Thorson was brought from the County Jail to Jerry Tootle's office in the CID for further questioning. Giraud testified that when Thorson was shown the knife, he stated, "Well, I guess you know the rest of the story." Thorson was then mirandized and he made a video taped confession admitting to the murder of Gloria McKinney.

5

Dr. Paul McGarry, a forensic pathologist, testified that he performed the autopsy on Gloria McKinney on March 8, 1987. In describing the injuries suffered by McKinney, Dr. McGarry stated that "she had a slash wound across the front of her neck that opened up her voice box, opened a hole in her larynx. She had a bullet wound to the head that went in the right temple, and had sprinkled around it gunpowder on the skin and hair, indicating it was close range." Dr. McGarry testified that the cause of McKinney's death was a "gunshot wound to the head at close range." The wound to the victim's neck would not have been fatal with proper management. A sexual assault kit was also performed on McKinney due to the extensive injuries to her genitals.

Michael Stroud, an employee of the Harrison County Sheriff's Department, testified that he executed a waiver to allow the Department to draw a sample of Thorson's blood. Stroud also testified that a rape kit was performed on the victim. Christopher Larson, employed by ReliaGene Technologies in New Orleans, Louisiana, testified that he performed a DNA analysis on the semen taken from the rape kit and the blood taken from Thorson. From the analysis, Larson was able to determine that "the vaginal swab from Gloria McKinney was consistent with the genetic profile from the blood of Roger Thorson." At the end of this testimony, the State rested. Thorson then moved for a directed verdict, and the trial court denied the motion.

During the defendant's case-in-chief, Patricia Cook, Thorson's former girlfriend, testified that she gave a statement to Giraud on March 9, 1987. Cook testified that she told the investigators that Thorson had buried evidence on some property near his home. Cook also testified that when Thorson arrived at her home on the night of March 4, 1987, he washed his hands with bleach.

Dr. George Tate, a clinical psychologist, testified that after spending ten and one-half hours with Thorson, reviewing police records and mental health reports, and conducting several psychological exams, Thorson was "not so impaired by mental disease or defect to make him incompetent to give a confession."

Richard Isham testified that he spoke with Thorson on March 7, 1987, at the Harrison County Jail. During the conversation, Isham was wearing a wire and tape recorder. Isham testified that he did not inform Thorson that their conversation was being recorded. Isham testified that when he asked Thorson about the crime, Thorson responded that "there is no circumstantial evidence and he was sticking to his story."

Thorson also testified during his case-in-chief. Thorson testified that he did go to Edgewater Mall to talk to McKinney. He stated that he only had her drive him to his house in Woolmarket. Thorson testified that during his interview he was threatened and physically abused. He stated that he only made the confession because he feared for the lives of McKinney's two young daughters. The defense rested. The State finally rested after offering no rebuttal testimony.

On June 7, 2002, the jury returned a verdict of guilty. A sentencing hearing was held, and, on June 8, 2002, the jury returned the verdict of death finding three aggravators:

1) That the capital offense was committed while engaged in the commission of a kidnapping;

2) The offense was heinous, cruel and torturous; and

3) The offense was committed with the purpose of covering up and hiding evidence.

*Thorson*, 895 So. 2d at 94-97 (¶¶ 2-13).

¶6. In today's appeal, Thorson raises five main issues concerning mental retardation; ineffective assistance of counsel; execution by lethal injection rising to the level of cruel and unusual punishment; the State's failure to produce exculpatory evidence during discovery; and cumulative error.

**ANALYSIS**

**I.** **WHETHER A MENTALLY RETARDED DEFENDANT HAS BEEN SENTENCED TO DEATH IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND CORRESPONDING STATE CONSTITUTIONAL PROVISIONS.**

¶7. Thorson contends that his execution would be unconstitutional under the Eighth and Fourteenth Amendments of the United States Constitution, corresponding state constitutional provisions, and *Atkins*, because he is mentally retarded. In *Atkins*, the United States Supreme Court determined that imposition of the death penalty on mentally retarded inmates constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. *Atkins*, 536 U.S. at 321. The *Atkins* majority cited two definitions of "mental retardation." The first was from the American Association on Mental Retardation (AAMR).

> "Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18."

*Id.* at 308, n.3 (citing Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 1992)). The second definition came from the American Psychiatric Association.

> "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18

8

years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."

*Id.* (citing "American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders" 41 (4th ed. 2000)). The *Atkins* decision did not define who is or is not mentally retarded for purposes of eligibility for a death sentence but instead "leaves to the States the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id.* 536 U.S. at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416-17, 91 L. Ed. 2d 335, 106 S. Ct. 2595 (1986)). *Atkins* was decided on June 20, 2002, twelve (12) days after Thorson was sentenced to death on June 8, 2002.

¶8. The State argues that the this issue is procedurally barred pursuant to Miss. Code Ann. § 99-39-21(1) (Rev. 2000) because *Atkins* was decided 434 days prior to the date Thorson filed his brief on direct appeal. It is the State's position that Thorson should have argued his claim of mental retardation on direct appeal. We disagree.

¶9. In *Chase v. State*, 873 So. 2d 1013, 1023 (Miss. 2004), this Court set forth specific requirements to be followed by the small number of persons with mental retardation claims who were convicted before *Atkins* and *Chase* were handed down. This Court decided *Chase* on May 20, 2004, almost two years after Thorson was convicted and nine months after he filed his direct appeal. This Court made clear that as a person convicted before *Atkins* was handed down, Chase constitutionally could not be denied the opportunity to present his mental retardation claim to the trial court where he had demonstrated that his IQ fell within the range of possible mental retardation, and he had presented an affidavit of a mental health

9

care professional that he suffered from "mild retardation." ***Id.***  Thorson falls into the small group of persons discussed in ***Chase***.

¶10.  Further, Thorson could not have argued ***Atkins*** before the trial court.  As stated previously, Thorson was convicted prior to ***Atkins***.  This Court repeatedly has stated that it will not consider assignments of error on appeal that were not first presented to the trial court.  "We have held that error not raised at trial or in post-trial motions may not be reviewed on appeal. ***Foster***, 639 So. 2d at 1289; ***Watts v. State***, 492 So. 2d 1281, 1291 (Miss. 1986)." ***Davis v. State***, 660 So. 2d 1228, 1246 (Miss. 1995).  This matter is properly presented to this Court on Thorson's petition for post-conviction relief because "in practical reality [it] could not be . . . raised at trial or on direct appeal." Miss. Code Ann. § 99-39-3(2) (Rev. 2000).

¶11.  This Court announced the requirements for obtaining a hearing to determine whether a capital defendant is mentally retarded as follows:

> With the sole exception discussed below, no defendant may be granted a hearing on the issue of Eighth Amendment protection from execution, due to alleged mental retardation unless, prior to the expiration of the deadline set by the trial court for filing motions, the defendant shall have filed with the trial court a motion, seeking such hearing. The defendant must attach to the motion an affidavit from at least one expert, qualified as described above, who opines, to a reasonable degree of certainty, that: (1) the defendant has a combined Intelligence Quotient ("IQ") of 75 or below, and; (2) in the opinion of the expert, there is a reasonable basis to believe that, upon further testing, the defendant will be found to be mentally retarded, as defined herein.
>
> Upon receiving such motion with attached affidavit, and any response filed by the State, the trial court shall provide a reasonable amount of time for testing the defendant for mental retardation. Thereafter, the trial court shall set a hearing on the motion, and the matter shall proceed.

***Chase,*** 873 So. 2d at 1029. This Court further held:

> . . . that no defendant may be adjudged mentally retarded for purposes of the Eighth Amendment, unless such defendant produces, at a minimum, an expert who expresses an opinion, to a reasonable degree of certainty, that:
>
> 1. The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association;
>
> 2. The defendant has completed the Minnesota Multi phasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.
>
> Such expert must be a licensed psychologist or psychiatrist, qualified as an expert in the field of assessing mental retardation, and further qualified as an expert in the administration and interpretation of tests, and in the evaluation of persons, for purposes of determining mental retardation.
>
> Upon meeting this initial requirement to go forward, the defendant may present such other opinions and evidence as the trial court may allow pursuant to the Mississippi Rules of Evidence.

***Id.***

> Later, in ***Lynch v. State***, 951 So. 2d 549 (Miss. 2007), this Court held that
>
> . . . in Mississippi it is acceptable to utilize the MMPI-II and/or other similar tests. [***Chase***] at 1029. This Court did not intend by its holding to declare the MMPI-II or any one test as exclusively sufficient. Having a variety of tests at their disposal, courts are provided with a safeguard from possible manipulation of results and diminished accuracy which might result if courts are limited to one test. The United States Supreme Court mentioned the Wechsler Adult Intelligence Scales Test. *See **Atkins***, 536 U.S. at 309 n.5, 122 S.Ct. 2442. Other tests, as suggested by mental health experts, include the Structured Interview of Reported Symptoms (SIRS), the Validity Indicator Profile (VIP), and the Test of Memory Malingering (TOMM).

***Id.*** at 556 (¶ 23).

> The Court's interpretation in this case as to the proper test to be administered with regard to an *Atkins* hearing supercedes any contrary decisions. This Court neither endorses the MMPI-II as the best test nor declares that it is a required test, and decisions that state otherwise are expressly overruled.

*Id.* at 557 (¶ 24).

¶12. The record in this case reveals that George T. Tate, Ph.D., a clinical psychologist, testified at Thorson's trial that he personally evaluated Thorson for roughly ten and a half hours. Additionally, Dr. Tate administered the Shipley intelligence test, the Wide Range Achievement Test, the Minnesota Multiphasic Personality Inventory-Revised, the Taylor Manifest Anxiety scale, the Beck Depression Inventory, and the Sentence Completion Test. Further, Dr. Tate reviewed a report on Thorson by Dr. Gasparrini from 1988. Dr. Tate testified that Dr. Gasparrini performed the Wechsler Adult Intelligence Scale-Revised (WAIS-R) on Thorson closer in time to the capital murder and found Thorson to have an IQ of 77. To check Dr. Gasparrini's results without repeating the test, Dr. Tate testified that he performed the Shipley test and determined Thorson to have an IQ of 74. Dr. Tate testified that Thorson was "borderline retarded."

¶13. At the sentencing phase, Dr. Tate testified that Thorson was "mentally handicapped, not to the degree of the mentally retarded, but that the intelligence is not adequate for many of the demands of life in stress situations." Dr. Tate emphasized Thorson's childhood was extremely unpleasant, that Thorson had a troubled relationship with his father, had nervous problems very early in school, and lacked self-direction in that he was easily influenced.

12

¶14.   Attached to his petition, Thorson provided this Court with an affidavit from Dr. Marc Zimmerman, a licensed psychologist, who states that he has met with Thorson and performed the following tests: Benton Visual Retention Test, 5th edition; Short Category Test; Wide Range Achievement Test, Revision 3; Wisconsin Card Sort Test; Stroop Color and Word Test; Screening Test for Luria-Nebraska Neuropsychological Battery; Wechler Adult Intelligence Scale, 3rd edition; Rey 15 Item Test, Test of Memory Malingering; and Luria Neuropsychological Battery.  Dr. Zimmerman states that Thorson has a full-scale IQ of 70. Dr. Zimmerman is of the "opinion to a reasonable degree of psychological certainty that Mr. Roger Eric Thorson meets the criteria established by the American Psychiatric Association (DSM) and the American Association on Mental Retardation to be classified as mentally retarded."   He also states in his affidavit that Thorson's adaptive behavior reveals deficits in functional academic skills, work, self-direction, and social/interpersonal skills and that it is documented that the onset of these deficits occurred before the age of eighteen.

¶15.   For the foregoing reasons, we find that Thorson has met the requirements established by this Court in *Chase* and it progeny and this matter should be remanded to the Circuit Court of the Second Judicial District of Harrison County for a hearing pursuant to *Atkins*, *Lynch* and *Chase*.

## II.   WHETHER THORSON RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.

¶16.   Thorson asserts that his trial counsel was ineffective for failing to develop and present evidence of mental retardation and other mitigating evidence during sentencing, for failing

13

to prepare the defense expert, for not being prepared at trial, and for failing to present evidence concerning lack of a valid *Miranda* waiver.

¶17. The test for ineffective assistance of counsel is well-settled. "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674. To prevail on this claim, Thorson must demonstrate that his counsel's performance was deficient and that the deficiency prejudiced the defense of the case. *Id.* at 687. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984) (citing *Strickland*, 466 U.S. at 687).

¶18. Defense counsel is presumed competent. *Washington v. State*, 620 So. 2d 966 (Miss. 1993). However, even where professional error is shown, a reviewing court must determine whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mohr v. State*, 584 So. 2d 426, 430 (Miss. 1991). When reviewing a case involving the death penalty, the most important inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer–including an appellate court, to the extent it independently re-weighs the evidence–would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695. If Thorson's post-conviction application fails on either

14

of the ***Strickland*** prongs, Thorson is not entitled to any relief on this issue. ***Foster v. State***, 687 So. 2d 1124, 1129-30 (Miss. 1996).

> **A.** **Failure to develop and present evidence of mental retardation, other neurological dysfunction and other mitigating evidence**.

> **1. Failure to perform an adequate mental health work-up.**

¶19. Thorson asserts that he is mentally retarded and that his counsel was ineffective for failing to develop evidence of his mental disorders and learning disabilities. Because we have already determined in Issue I that this case must be remanded to the trial court to conduct an ***Atkins*** hearing, this sub-issue is moot.

¶20. Notwithstanding the mootness of this sub-issue, we also find this sub-issue to be without merit. During the guilt phase, Thorson's counsel did call Dr. Tate, who testified that he personally evaluated Thorson for roughly ten and one-half hours, performed the numerous tests described in Issue I, and concluded that Thorson had an IQ of 74. Dr. Tate testified that Thorson was "borderline retarded."

> **2. Other failures to adequately investigate mitigation.**

¶21. Again, Thorson argues many inadequacies of his trial counsel for failing to investigate various matters that would have aided in showing that he is mentally retarded. Again, this issue is moot, but also without merit.

¶22. As discussed previously, counsel called Dr. Tate, who told the jury that Thorson was borderline mentally retarded. Thorson's mother also testified about Thorson's troubles with learning in school and childhood illnesses. Inasmuch as Thorson's case was tried prior to the

15

U. S. Supreme Court's decision in *Atkins*, we refuse to find the performance of Thorson's trial counsel deficient for failure to further investigate the mental retardation issue. We thus find that Thorson has failed to meet the standard set forth in *Strickland* on this sub-issue.

### 3. Need for additional mitigation evidence.

¶23. Under this sub-issue, Thorson does not argue that his trial counsel was ineffective, but instead, he simply asserts that Hurricane Katrina has made it difficult for post-conviction counsel to investigate, develop and corroborate significant mental health issues. There is no issue raised here. However, the sub-issue is moot insofar as it advances Thorson's claim of mental retardation.

### B. Inadequate preparation of experts for trial and failure to investigate.

#### 1. Failure to properly consult with a DNA expert, failure to consult a serologist, and failure to adequately investigate DNA testing.

¶24. Thorson asserts that his counsel was ill-prepared to defend Thorson on DNA issues. Thorson admits that "over a series of arguments and ardent warnings by the Court, the defense won and testing of the semen sample [taken from the body of Gloria McKinney] for DNA went forward." At the State's recommendation, ReliaGene in New Orleans, LA, performed the DNA testing. Thorson asserts that his counsel was not prepared to cross-examine the State's DNA expert from ReliaGene so as to attack shortfalls in the testing and suggest that the test raised the possibility that someone else's DNA could have been present along with Thorson's in the sample.

16

¶25. According to the affidavit of Thorson's trial counsel, Ron Acton was retained as an expert to prepare Thorson's defense for DNA issues. Prior to the prosecution calling the ReliaGene witness, Thorson's attorney made the following request of the Court:

> MR. SMITH: Okay. Before he puts ReliaGene on, I need an opportunity to make a quick phone call to my expert, just ask him two questions that he was checking on for me. I talked to him about it last night.

Donald Smith further states in his affidavit that he had never cross-examined a witness about DNA testing prior to Thorson's trial. Kellie Koenig Lawler states in her affidavit that she had never dealt with DNA prior to Thorson's trial. As the State points out, a review of the cross-examination of the ReliaGene witness by Thorson's trial counsel easily allows one to draw the conclusion that Dr. Acton assisted counsel in preparation for cross-examination. Thorson cannot show that his counsel was deficient.

¶26. Further, even assuming, *arguendo*, that his attorneys were deficient, Thorson cannot show that the outcome of his trial would have been different. The ReliaGene expert testified that the DNA from sperm retrieved from the victim's body matched Thorson's, and that the chance of finding another individual with the same genetic profile was one in ten billion. Thorson testified that he had a sexual encounter with the victim on March 4, 1987. He also confessed to killing Gloria McKinney in his taped confession to the police. This sub-issue has no merit.

### 2. Failure to investigate the physical evidence to find inconsistencies with Thorson's confession.

¶27. Thorson asserts that once his counsel knew that the confession was not going to be suppressed, counsel should have conducted an investigation of the physical evidence to look for inconsistencies with Thorson's confession. Thorson first offers the affidavits of two entomologists wherein it is stated that due to the lack of insect infestation on McKinney's body when found on March 7, 1987, McKinney's body could not have been in the wooded area since March 4, when Thorson confessed to having killed her. They assume that there was no insect infestation on the body because there was no mention of insect infestation by the investigating officers or in the coroner's report.

¶28. Thorson also argues that his counsel should have challenged the time of death. He offers the affidavit of Dr. Kris Sperry, Chief Medical Examiner for the State of Georgia, who concludes in his affidavit that he is of the opinion that McKinney was killed and left in the position in which she was found in the late afternoon of, or on the night of, March 6, 1987.

¶29. Thorson further contends that his counsel was ineffective for not investigating the blood spatter evidence, and he offers the affidavit of Ronald L. Singer, a crime lab director from Fort Worth, Texas. Singer states in his affidavit that "[b]ased on my preliminary evaluation, I believe there may be some significant discrepancies between the information provided by Roger Thorson in his confession and the evidence at the crime scene. . . ." Singer clearly states that his opinion is preliminary and that he would have to examine all of the evidence from the scene and elsewhere in this case.

18

¶30. In addition to Thorson's videotaped confession, the jury was presented with the direct evidence of Thorson's DNA found on the victim. The jury also heard testimony from Patricia Cook, Thorson's girlfriend at the time, who testified that on March 4, 1987, Thorson came home and washed his hands with bleach. She further testified that Thorson told her that he had buried the weapons used to murder McKinney in a vacant lot and that he also admitted to killing McKinney. The weapons used to murder McKinney were retrieved by law enforcement after receiving a tip from Patricia Cook on March 9, 1987. The weapons had been buried in a vacant lot between Thorson's trailer and the trailer belonging to Patricia Cook. Investigator Tootle testified that when he showed Thorson the recovered knife used to cut McKinney's throat, Thorson stated "Well, I guess you know the rest of the story."

¶31. There is no constitutional right to errorless counsel. *Mohr v. State*, 584 So. 2d 426, 430 (Miss. 1991) (right to effective counsel does not entitle defendant to have an attorney who makes no mistakes at trial; defendant only has right to have competent counsel); *Cabello v. State*, 524 So. 2d 313, 315 (Miss. 1988); further, this Court has held that

> [t]he duty to investigate and prepare is not limitless and not every breach means that counsel has failed to render reasonably effective assistance. "Counsel for a criminal defendant is not required to pursue every path until it bears fruit or until all conceivable hope withers." *Lovett v. Florida*, 627 F.2d 706, 708 (5th Cir. 1980). This issue is without merit.

*Brown v. State*, 798 So. 2d 481, 497 (Miss. 2001)

¶32. While Thorson faults counsel for not investigating physical evidence to identify the inconsistencies with his confession, the record is full of independent evidence that is consistent with and supports Thorson's confession. Even if this Court were to determine that

19

Thorson's counsel was deficient for not pursuing these paths until they bore fruit (which determination we do not make), Thorson still cannot show that the outcome of his trial would have been different. Therefore, this issue does not pass the standard set forth in *Strickland* and must fail. *Mohr,* 584 So. 2d 426, 430 (Miss. 1991); *Neal v. State*, 525 So. 2d 1279, 1281 (Miss. 1987).

### III. WHETHER EXECUTION BY LETHAL INJECTION AMOUNTS TO CRUEL AND UNUSUAL PUNISHMENT.

¶33.    It is Thorson's contention that execution by lethal injection constitutes cruel and unusual punishment. This is the first time Thorson has raised this issue, and it was capable of being raised on direct appeal. The issue is now procedurally barred from further consideration on collateral appeal. Miss. Code Ann. § 99-39-21(1) (Rev. 2000). In *Jordan v. State*, 918 So. 2d 636, 661 (Miss. 2005), the petitioner failed to raise lethal injection as an Eighth Amendment claim and this Court employed the procedural bar.

> Jordan failed to make any claim relating to the method of execution at trial or on direct appeal. Therefore, this claim is barred for consideration for the first time on application for leave to seek post-conviction relief. *See* Miss. Code Ann. § 99-39-21(1); *Bishop v. State*, 882 So. 2d 135, 149 (Miss. 2004); *Grayson v. State*, 879 So. 2d 1008, 1020 (Miss. 2004).

*Id.*

¶34.    Notwithstanding the procedural bar, this Court, in *Jordan*, looked to the merits of the claim and found none based on Jordan's failure to submit any sworn proof as required by Miss. Code Ann. § 99-39-9(1)(e) (Rev. 2000). *Id.* at 662. Likewise, counsel for Thorson

20

fails to submit any affidavit which legitimately questions the lethal injection protocol employed by the Mississippi Department of Corrections. This issue is without merit.

### IV. WHETHER THE STATE FAILED TO PRODUCE EXCULPATORY AND OTHER FAVORABLE EVIDENCE.

¶35. In **Carr v. State,** 873 So. 2d 991, 999 (Miss. 2004), we stated:

> In **Brady v. Maryland**, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963), the United States Supreme Court established the principle that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In determining whether a **Brady** violation has occurred, and thus a new trial is mandated, this Court applies the four-part **Brady** test adopted in **King v. State**, 656 So. 2d 1168, 1174 (Miss. 1995), under which the defendant must prove:
>
> > a. that the State possessed evidence favorable to the defendant (including impeachment evidence);
> > b. that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence;
> > c. that the prosecution suppressed the favorable evidence; and
> > d. that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.
>
> **Id.** at 1174.

**Id.** at 999.

¶36. Thorson presents this Court with a list of items which he asserts *may* not have been provided by the State to the defense in violation of **Brady**. **Brady**, 373 U.S. at 83. Thorson, however, admits that uncovering **Brady** violations has been hampered because all of the files on his case that were retained by Donald Smith, lead defense counsel, were destroyed by Hurricane Katrina. Kellie Koenig Lawler, Thorson's other trial counsel, stated in her affidavit that she provided Thorson's post-conviction counsel with two boxes of files on

21

Thorson, but she knows there were more that have either been lost or destroyed by Hurricane Katrina.

¶37.   DNA information from Reliagene – Thorson asserts that the State did not provide important exculpatory data from ReliaGene.  To support this contention, Thorson provided an affidavit from a Randell T. Libby, Ph.D, who holds a doctoral degree in molecular genetics.  At the request of Thorson's post-conviction counsel, Dr. Libby was requested to offer an opinion as to the test results/data provided to him.  In his affidavit, Dr. Libby identifies several forms of data that were not supplied to him, which he claims *may* contain exculpatory information.

¶38.   The possibility that more data, which has not been received by Dr. Libby from ReliaGene for post-conviction purposes, *may* lead to exculpatory information does not show that the State, at the time of trial, had evidence in its possession that was favorable to Thorson and that went undisclosed to the defense.  Thorson has not met the four-part **Brady** test adopted in **King**.  **King**, 656 So. 2d at 1174.  This issue is without merit.

¶39.   Rap Sheets and NCIC information on Patricia Cook – Thorson next asserts that the State has violated **Brady** by not providing background information on Patricia Cook, a person whom the defense believed was involved in the crime.  The record reflects that Thorson prevailed on a pretrial motion seeking the rap sheets and NCIC information on Cook.  At trial, Thorson's counsel called Cook as a witness and questioned her at great length. We can reasonably deduce from this occurrence that Thorson's counsel did receive the information requested by the motion.  The record does not indicate any objection by Thorson claiming

22

that the information was not received before trial. If the information was, in fact, not received, the issue is waived because it was capable of being raised at trial. Miss. Code Ann. § 99-39-21(1) (Rev. 2000).

¶40. Remaining claims of *Brady* violations – Thorson's remaining assertions under the claim of *Brady* violations include that the State did not provide background on other witnesses called by the prosecution and the defense. Thorson does not identify those witnesses. He also asserts that the State did not disclose information omitted from police reports, including interviews of other witnesses and knowledge of the location of physical evidence, such as the wallet that Thorson claimed to have thrown in the woods. Thorson asserts that the State did not disclose evidence of lengthy interrogations, which Thorson claims would have shown his confession to have been neither voluntary nor accurate. As the State properly points out, these remaining claims are offered without specificity and cannot be shown to meet any of the four-part *Brady* test. *Brady*, 373 U.S. at 83.

¶41. Ineffective assistance of counsel claim – Lastly, Thorson pleads ineffective assistance of counsel in the alternative with respect to any of his *Brady* violation claims that we find to be without merit. Thorson does not pursue these alternatively-pled ineffective assistance of counsel claims with authority or any argument whatsoever. Therefore, the issues are deemed abandoned. *Drennan v. State*, 695 So. 2d 581, 585-86 (Miss. 1997); *Hoops v. State*, 681 So. 2d 521, 526 (Miss. 1996); *Kelly v. State*, 553 So. 2d 517, 521 (Miss. 1989); *Smith v. State*, 430 So. 2d 406, 407 (Miss. 1983); *Ramseur v. State*, 368 So. 2d 842, 844 (Miss. 1979).

23

## V. WHETHER THERE IS CUMULATIVE ERROR.

¶42. Thorson raised the issue of cumulative error as to both federal and state law on direct appeal. *Thorson*, 895 So. 2d at 131-32. This court found the issues to be without merit. The State now contends that the issue is procedurally barred by the doctrine of *res judicata* pursuant to Miss. Code Ann. § 99-39-21(3) (Rev. 2000). Pursuant to Miss. Code Ann. § 99-39-3(2) (Rev. 2000), a post-conviction relief motion serves the purpose of providing a limited procedure for review of issues that, "in practical reality could not be or should not have been raised at trial or on direct appeal." It stands to reason that post-conviction issues, reviewed for the first time, can be subjected to cumulative-error scrutiny without being barred by the doctrine of *res judicata.* Therefore, the State's argument fails.

¶43. In his motion for post-conviction relief, Thorson contends generally that the alleged preceding errors, taken as a whole, deprived him of a fair trial. The standard of review for an appeal from a capital murder conviction and death sentence is that of "heightened scrutiny." ***Balfour v. State***, 598 So. 2d 731, 739 (Miss. 1992) (citing ***Smith v. State***, 499 So. 2d 750, 756 (Miss. 1986); ***West v. State***, 485 So. 2d 681, 685 (Miss. 1985)). All doubts are to be resolved in favor of the accused because "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." ***Id.*** (quoting ***Irving v. State***, 361 So. 2d 1360, 1363 (Miss. 1978)). *See also* ***Fisher v. State***, 481 So. 2d 203, 211 (Miss. 1985).

¶44. When it comes to issues of alleged cumulative error, the Court previously has taken note of those capital cases in which the opinions of this Court articulated differing analyses.

24

For example, in ***McFee v. State***, 511 So. 2d 130, 136 (Miss. 1987) (rape conviction and life sentence affirmed), this Court addressed each assignment of error and found none, be it harmless or otherwise, by the trial court. Based on that finding, this Court stated:

> In sum, McFee contends that the cumulative effect of the alleged errors was sufficient to prejudice the jury, essentially allowing the State to convict him not of rape, but of murder. Yet, as discussed, neither the introduction of the photographs nor the prosecutor's comments constituted reversible error. As there was no reversible error in any part, so there is no reversible error to the whole.

***Id.***

¶45.    In ***Jenkins v. State***, 607 So. 2d 1171, 1183-84 (Miss. 1992) (capital murder conviction and death sentence reversed and remanded), in which this Court found both harmless error and reversible error by the trial court, this Court stated:

> If reversal were not mandated by the State's discovery violations, we would reverse this matter based upon the accumulated errors of the prosecution. This Court has often ruled that errors in the lower court that do not require reversal standing alone may nonetheless taken cumulatively require reversal.

***Id.*** (citing ***Griffin v. State***, 557 So. 2d 542, 552-53 (Miss. 1990)).

¶46.    In ***Manning v. State,*** 726 So. 2d 1152, 1198 (Miss. 1998) (capital murder convictions and death sentence affirmed), the Court addressed twenty-one assignments of error with sub-parts, and made numerous findings of no "reversible error." We stated:

> This Court has held that individual errors, not reversible in themselves, may combine with other errors to make up reversible error. ***Hansen v. State***, 592 So. 2d 114, 142 (Miss. 1991) [n5 ]; ***Griffin v. State***, 557 So. 2d 542, 553 (Miss. 1990). The question under these and other cases is whether the cumulative effect of all errors committed during the trial deprived the defendant of a fundamentally fair and impartial trial. Where there is "no reversible error in any part, . . . there is no reversible error to the whole." ***McFee v. State***, 511 So. 2d 130, 136 (Miss. 1987).

25

*Manning*, 726 So. 2d at 1198.

¶47. This Court reconciled these different views in ***Byrom v. State***, 863 So. 2d 836 (Miss.

2003) and held:

> What we wish to clarify here today is that upon appellate review of cases in which we find harmless error or any error which is not specifically found to be reversible in and of itself, we shall have the discretion to determine, on a case-by-case basis, as to whether such error or errors, although not reversible when standing alone, may when considered cumulatively require reversal because of the resulting cumulative prejudicial effect. That having been said, for the reasons herein stated, we find that errors as may appear in the record before us in today's case, are individually harmless beyond a reasonable doubt, and when taken cumulatively, the effect of all errors committed during the trial did not deprive Michelle Byrom of a fundamentally fair and impartial trial. We thus affirm Byrom's conviction and sentence.

*Id.* at 846-47.

¶48. After a careful review of the record in the present case, we conclude that the record

supports no finding of error or errors, which when considered cumulatively, had any

prejudicial effect which deprived Thorson of a fundamentally fair and impartial trial. We

thus find this issue to be without merit.

**CONCLUSION**

¶49. Except for one issue, we find that Thorson's petition for post-conviction relief is

without merit; however, because Thorson meets the requirements articulated by this Court

in ***Chase*** and has not been afforded an ***Atkins*** hearing, this matter is remanded to the Circuit

Court of the Second Judicial District of Harrison County for an evidentiary hearing pursuant

to ***Atkins***, ***Lynch*** and ***Chase***.

26

¶50.    **PETITION FOR POST-CONVICTION RELIEF IS DENIED IN PART AND GRANTED IN PART.  THIS CASE IS REMANDED TO THE CIRCUIT COURT OF THE SECOND JUDICIAL DISTRICT OF HARRISON COUNTY FOR AN EVIDENTIARY HEARING CONSISTENT WITH *ATKINS, CHASE* AND *LYNCH*.**

**SMITH, C.J., WALLER AND DIAZ, P.JJ., EASLEY, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR.  GRAVES, J., CONCURS IN RESULT ONLY.**