# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2010-CA-01010-SCT

*ROGER ERIC THORSON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/04/2010 |
| TRIAL JUDGE: | HON. ROGER T. CLARK |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JIM DAVIS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JASON LEWIS DAVIS |
| | MARVIN L. WHITE, JR. |
| NATURE OF THE CASE: | CIVIL - POST-CONVICTION RELIEF |
| DISPOSITION: | AFFIRMED - 09/15/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    Roger Eric Thorson was indicted on June 3, 1987, and charged with the capital murder of Gloria McKinney, his ex-girlfriend, during the commission of a kidnapping on March 4, 1987. On Thorson's direct appeal of his capital-murder conviction and sentence of death, this Court affirmed the trial court on all issues except a ***Batson*** issue, and the case was remanded to the trial court to conduct a ***Batson*** hearing.[1] ***Thorson v. State***, 653 So. 2d 876, 896 (Miss.

---

[1] ***Batson v. Kentucky***, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

1994). On remand, the trial court found no *Batson* violation, thus holding that Thorson was not entitled to a new trial. *Thorson v. State*, 721 So. 2d 590, 592 (Miss. 1998). On appeal, this Court found that the trial court had committed reversible error in allowing the State to peremptorily strike a member of the jury venire based solely on her religious affiliation, in violation of Article 3, Section 18 of the Mississippi Constitution and Mississippi Code Section 13-5-2. *Id.* at 598. Thus, the case was reversed and remanded for a new trial. *Id.* After another jury trial, Thorson was again convicted for the crime of capital murder and sentenced to death by lethal injection, and on appeal, this Court affirmed both the conviction and sentence. *Thorson v. State*, 895 So. 2d 85, 132 (Miss. 2004). The United States Supreme Court denied Thorson's petition for writ of certiorari on October 3, 2005. *Thorson v. Mississippi*, 546 U.S. 831, 126 S. Ct. 53, 163 L. Ed. 2d 83 (2005).

¶2.     Thorson subsequently filed a Petition for Post-Conviction Relief with this Court, seeking an *Atkins* hearing pursuant to *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002); *Lynch v. State*, 951 So. 2d 549 (Miss. 2007); and *Chase v. State*, 873 So. 2d 1013 (Miss. 2004). *See Thorson v. State*, 994 So. 2d 707, 709 (Miss. 2007). We granted Thorson relief and permitted him an evidentiary hearing to determine whether he was mentally retarded. *Id.* On January 7-8, 2010, the Circuit Court of the Second Judicial District of Harrison County conducted a hearing, with Judge Roger T. Clark presiding. After the hearing, Judge Clark took the matter under advisement, directed the court reporter to transcribe the proceedings and to furnish copies of the transcript to counsel for the parties, and established a briefing schedule. Once all briefs had been submitted, Judge Clark, on June 4, 2010, entered an eight-page order thoroughly discussing the issue before him and finding

2

that Thorson was not mentally retarded under *Atkins*. Upon entry of this order denying his petition for post-conviction relief under *Atkins*, Thorson appealed to us.

¶3. The Court heard oral arguments of counsel and received from the parties, through counsel, post-argument citation of supplemental authority under Mississippi Rule of Appellate Procedure 28(j). Upon review, we find that the trial court did not abuse its discretion by finding that Thorson was not mentally retarded. The record supports the trial court's finding that Thorson failed to meet the first prong of *Atkins*, 536 U.S. 304.

## PROCEEDINGS IN THE TRIAL COURT

¶4. At the evidentiary hearing on January 7-8, 2010, both the defense and the State offered expert testimony on the issue of whether Thorson was mentally retarded under *Atkins*, which required Thorson to show that: (1) he had significantly subaverage intellectual functioning; (2) he had deficits in two or more adaptive skills; (3) he was eighteen years of age or younger when the retardation manifested itself; and (4) he was not malingering. *See Chase*, 873 So. 2d at 1027-29 (interpreting *Atkins*, 536 U.S. 304).

¶5. Thorson called Dr. Victoria Swanson and Dr. Mark Zimmerman,[2] who both testified that Thorson was mentally retarded. In rebuttal, the State called Dr. Gilbert MacVaugh and Dr. Reb McMichael, who disagreed with Thorson's experts and opined that Thorson was not mentally retarded. Both parties' experts either conducted or had other psychologists to

---

[2]Dr. Zimmerman did not determine whether Thorson had deficits in adaptive functioning under the second *Atkins* prong. He performed no testing for deficits in adaptive functioning. Rather, Dr. Zimmerman testified that Thorson's IQ established that Thorson had satisfied the first *Atkins* prong.

conduct IQ tests on Thorson. Both parties' experts[3] also relied on IQ tests formerly

conducted on Thorson in reaching their opinions. Accordingly, for the first prong, the trial

court heard expert testimony based, *inter alia*, on three IQ tests and two psychiatric

examinations:

- Dr. William Gasparrini conducted the WAIS-R[4] on Thorson in 1988, finding that Thorson had a full-scale IQ of 77.
- Dr. Henry Maggio conducted a psychiatric examination on Thorson in 2002 and agreed with an IQ score of 77.
- Dr. Mark Zimmerman conducted the WAIS-III[5] on Thorson in 2005, finding that Thorson had a full scale IQ of 70.
- Dr. Victoria Swanson conducted several examinations on Thorson, reviewed the IQ tests performed on Thorson, and opined that Thorson had an IQ of 71 to 72.
- Dr. Gilbert MacVaugh, with the aid of his team at Whitfield, conducted the WAIS-III on Thorson, finding his IQ to be 79.

¶6.     Having heard testimony from both parties' experts and having considered all the IQ

tests performed on Thorson, the trial court found that Thorson had failed to show that he had

an IQ of 75 or below:

> All of the IQ test scores contained in this record were administered after 1987, the date of the crime. The earliest tests resulted in full scale I.Q. results of 77 and 79. Dr. William Gasparrini administered the WAIS-R to Thorson in 1988 and found his "full scale I.Q. to be 77." In 2000, Dr. George Tate reported that Thorson's mother told him that the school told her that Thorson was just above the level for special ed classes. Dr. Henry Maggio conducted a psychiatric examination of Thorson on February 28, 2002, and agreed with the IQ score of 77. The reports of these doctors were submitted as evidence, and were reviewed by all of the experts. Dr. Gilbert S. MacVaugh, as part of a team of forensic clinicians at Whitfield, evaluated Thorson on August 25, 2008, and

---

[3]Dr. William Gasparrini and Dr. Henry Maggio did not testify at the hearing. Only Dr. McMichael, Dr. Swanson, Dr. Zimmerman, and Dr. MacVaugh testified at the hearing.

[4]Wechsler Adult Intelligence Scale-Revised.

[5]Wechsler Adult Intelligence Scale-Third Edition.

4

found he was not mentally retarded. At that time Thorson achieved a "full scale" I.Q. of 79. Defense expert, Dr. Mark Zimmerman, tested Thorson in 2005 and placed Thorson's I.Q. at 70. He reached this result in part by adjusting the raw score based on the "Flynn Effect."

. . . .

As the fact-finder, it is clear to this Court that Roger Thorson's I.Q. has not been proven to be 75 or below . . . .

¶7. In reaching his conclusion that Thorson did not have an IQ of 75 or below, the trial judge did not find Thorson's experts' reliance on the Flynn Effect to be persuasive. The Flynn Effect "is a phenomenon positing that, over time, standardized IQ test scores tend to increase with the age of the test without a corresponding increase in actual intelligence in the general population. Those who follow the Flynn Effect adjust for it by deducting from the IQ score a specified amount for each year since the test was normalized." *Wiley v. Epps*, 625 F. 3d 199, 203 n.1 (5th Cir. 2010) (citing *In re Salazar*, 443 F. 3d 433 n.1 (5th Cir. 2006)).

¶8. Notwithstanding the trial court's finding that Thorson had not met the first prong of *Atkins*, the trial court, "out of an abundance of caution . . . reviewed the evidence regarding the other three prongs of the *Atkins* test, adaptive skills, manifestation before age eighteen, and malingering."[6] As to the second *Atkins* prong, addressing whether Thorson had shown at least two deficits in adaptive functioning, the State did not retrospectively assess Thorson for adaptive functioning by applying standardized tests, maintaining that retrospective testing for adaptive functioning is not standardized for use with offenders who have been

[6]In actuality, after addressing adaptive skills, Judge Clark found that "[w]ithout sufficient proof to establish deficits in adaptive functioning, there is no need to address malingering or proof of mental retardation onset prior to age eighteen."

5

incarcerated for a number of years. Instead, to make its determination, the State reviewed more than 300 documents pertaining to Thorson's history and interviewed Thorson, but did not conduct personal interviews of any witnesses. Based on this research, Dr. MacVaugh concluded that Thorson's only adaptive deficit was in the area of functional academics.

¶9.    In contrast, Dr. Swanson conducted a Vineland-II Adaptive Behavior Scales (VABS-II) test and an Adaptive Behavior Assessment System-II (ABAS-II)[7] to determine whether Thorson had deficits in adaptive functioning. Specifically, she administered these tests retrospectively[8] to Thorson's former girlfriend and a co-worker of Thorson's from the 1980s. Applying these tests, Dr. Swanson ultimately concluded that, prior to the age of eighteen, Thorson's

> subdomain standard scores indicate that, at about the age of 18 to 22, deficits (2 or more standard deviations below the mean) existed in the areas of (1) communication; (2) functional academic skills; (3) self-care; (4) use of community resources; (5) social/interpersonal relationships; (6) leisure; (7) self-direction; (8) health; and (9) work.

¶10.    Aside from the Vineland test, Dr. Swanson also interviewed several other witnesses familiar with Thorson and reviewed numerous documents relating to Thorson's history. She

---

[7]According to Dr. Swanson's report, the VABS-II and the ABAS-II are "the three preferred standardized instruments currently used in assessing adaptive behavior" and are considered the "gold standard in these types of assessments."

[8]The onset of mental retardation for *Atkins* has to be before the defendant is older than eighteen years of age. Accordingly, Dr. Swanson had to apply her Vineland tests retrospectively on Thorson, now a middle-aged man. Experts for each side agreed that being on death row for twenty years could have had an effect, either positively or negatively, on Thorson's adaptive functioning.

conducted other tests[9] on Thorson, including the Woodcock Johnson test to assess Thorson's academic functioning. Dr. Swanson testified that, based on the Woodcock Johnson test, Thorson had a score of 52 in oral communication, consistent with a first-grade level and "much lower in comprehension, fifth grade spelling, fourth grade math." The Wide Range Achievement Test, Fourth Edition (WRAT-4) revealed that Thorson's word recognition was on a sixth-grade level.

¶11. In light of these findings, her mental examination of Thorson, and the Vineland test, Dr. Swanson further concluded that Thorson currently had "significant limitations," which satisfied *Atkins*'s second prong, in communication, functional academics, self-direction, and work skills.[10]

¶12. Viewing all the evidence offered at the hearing concerning Thorson's adaptive functioning, the trial court found Dr. Swanson's retrospective tests to be "unreliable and unpersuasive." The trial court stated,

> Dr. Swanson's opinion is that Thorson is deficient in at least eight areas of adaptive functioning with "significant limitations" in 1) communication, 2) functional academics, 3) self direction and 4) work skills . . . . The Court has given careful consideration to all available evidence and the experts' interpretation of it. The defense would discount Dr. MacVaugh's opinions because he reviewed the voluminous documents and interviewed Thorson, but conducted no "personal interviews of any witness" to support his opinion. Dr.

_____

[9]On page twenty of her report, Dr. Swanson discussed a mental-status examination that she had conducted. She also conducted the WRAT-4 (Wide Range Achievement Test, Fourth Edition).

[10]Dr. Swanson testified that she had found eight adaptive deficits in Thorson prior to the age of eighteen and four as an adult: "The testing that I did and others did, the affidavits I looked at, testing I did, indicated to me that he met the adaptive criteria prior to the age of 18, and I listed here eight of the eleven areas. And at this time it's my opinion that he meets them in four."

7

Swanson reviewed the same material, and administered retrospective tests to Thorson's former girlfriend and a co-worker of Thorson's at Morrison's Cafeteria in the mid to late 1980s . . . Dr. Swanson also interviewed Thorson's birth mother, adopted sister, uncles and aunts, cousins, a schoolteacher and special education administrator. Some of these interviews confirmed information previously provided but did not provide any new information that is persuasive in making an Atkins determination. Dr. McMichael, expert for the state, testified that the retrospective testing administered by Dr. Swanson should be viewed with a "great deal of scepticism [sic]." The Court finds the application of the retrospective Vineland tests unreliable and unpersuasive.

¶13. The trial judge then specifically discussed the evidence in support of his conclusion that Thorson had failed to prove adaptive deficits in communication and work skills. He found that the "record is replete with examples of Thorson's ability to communicate, albeit not always truthfully." He also found that a social-history evaluation performed circa 2001 noted that Thorson's development was within the normal range; Thorson's medical requests from 1988 to 1998 demonstrate an ability to ask for specific medications and to monitor the medications he received; and a neurologist, Dr. Sidney Smith, had examined Thorson on April 3, 1987, and had found that Thorson was "completely oriented" and without "cognitive deficits." The trial court also pointed out that Dr. McMichael had testified Thorson's vocabulary and word use, as demonstrated in his videotaped statement, was not consistent with a mentally retarded person.

¶14. Regarding work skills, the trial court found that Thorson had maintained several jobs from 1974 to 1987, and some of those jobs had lasted for more than a year. The trial court reasoned that the record did not reveal why Thorson had left these jobs or had been asked to leave. Additionally, the trial court noted that Thorson, in a 2008 interview, had stated "that

he used marijuana beginning at age thirteen and did 'thirty-five to forty joints' daily until he was nineteen."

¶15. Both Dr. MacVaugh and Dr. Swanson agreed that Thorson had a deficit in academic functioning. The trial judge even stated that "except for the deficit in academics the defendant has failed to establish significant deficits in any other adaptive functioning." However, the trial court further explained that Thorson had failed to prove by a preponderance of the evidence that Thorson's academic deficits "were caused by his mental retardation." Accordingly, the trial court concluded that Thorson did not have a deficit in academic functioning for purposes of *Atkins*. The trial judge did not provide any specific discussion as to why Thorson did not have a deficit in self-direction.

¶16. In today's appeal, Thorson argues that the trial court committed clear error when it found that Thorson was not mentally retarded under *Atkins*. Thorson alleges that the trial court committed several errors, arguing that the trial court abused its discretion (1) in permitting Dr. MacVaugh and Dr. McMichael to offer expert testimony for the State related to the assessment or diagnosis of mental retardation; (2) by not relying on Dr. Swanson's and Dr. Zimmerman's expert assessments and diagnoses of mental retardation; (3) by accepting Dr. MacVaugh's and Dr. McMichael's determination that Thorson did not exhibit significantly subaverage intellectual functioning; (4) by rejecting Dr. Swanson's and Dr. Zimmerman's determination that Thorson exhibited significantly subaverage intellectual functioning; (5) by ignoring scientifically established errors of measurement for the assessment of significantly subaverage intellectual functioning; (6) by accepting Dr. MacVaugh's and Dr. McMichael's determinations that Thorson did not have concurrent

9

deficits or impairments in at least two areas of adaptive functioning; (7) by rejecting Dr. Swanson's determination that Thorson exhibited concurrent deficits or impairments in at least two areas of adaptive functioning; (8) by rejecting Dr. Swanson's use of retrospective testing for adaptive functioning; (9) by rejecting Dr. Swanson's clinical judgment; and (10) by applying an incorrect standard to the adaptive-functioning prong of a mental-retardation assessment and ignoring clear evidence of onset prior to age eighteen.

¶17.    For purposes of this opinion, we have combined some of these issues. Moreover, because this Court finds the first issue to be dispositive, we do not address the second *Atkins* prong – deficits in adaptive functioning – or any issues raised by Thorson pertaining thereto.

**DISCUSSION**

¶18.    "When reviewing a lower court's decision to deny a petition for post conviction relief this Court will not disturb the trial court's factual findings unless they are found to be clearly erroneous." *Doss v. State*, 19 So. 3d 690, 694 (Miss. 2009) (citing *Brown v. State*, 731 So. 2d 595, 598 (Miss. 1999)) (citations omitted). This Court "must examine the entire record and accept 'that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact . . . .'" *Doss*, 19 So. 3d at 694 (citing *Mullins v. Ratcliff*, 515 So. 2d 1183, 1189 (Miss. 1987)) (citations omitted).

¶19.    However, "'where questions of law are raised the applicable standard of review is de novo.'" *Doss*, 19 So. 3d at 694 (citing *Brown v. State*, 731 So. 2d at 598). "The burden of proof at an evidentiary hearing on a PCR case is on the petitioner to show 'by a

10

preponderance of the evidence' that he is entitled to relief." *Doss*, 19 So. 3d at 694 (citing

Miss. Code Ann. § 99-39-23(7) (Rev. 2007).

¶20.    In *Atkins*, 536 U.S. at 321, the United States Supreme Court held that imposing the

death penalty on mentally retarded inmates constituted cruel and unusual punishment in

violation of the Eighth Amendment to the United States Constitution. The *Atkins* decision

left to the States "the task of developing appropriate ways to enforce the constitutional

restriction upon [their] execution of sentences." *Lynch*, 951 So. 2d at 556 (citing *Atkins*, 536

U.S. at 317) (citations omitted).

¶21.    In *Atkins*, the majority approvingly cited two definitions of mental retardation. The

American Association on Mental Retardation[11] (AAMR) provided one definition:

> Mental retardation refers to substantial limitations in present functioning. It is
> characterized by significantly subaverage intellectual functioning existing
> concurrently with related limitations in two or more of the following
> applicable adaptive skill areas: communication, self-care, community use, self-
> direction, health and safety, functional academics, leisure, and work. Mental
> retardation manifests before age 18.

*Chase*, 873 So. 2d at 1027 (quoting *Atkins*, 536 U.S. at 308 n.3). The American Psychiatric

Association (APA) provided the second, similar definition of mental retardation:

> The essential feature of Mental Retardation is significantly subaverage general
> intellectual functioning (Criterion A) that is accompanied by significant
> limitations in adaptive functioning in at least two of the following skill areas:
> communication, self-care, home living, social/interpersonal skills, use of
> community resources, self-direction, functional academic skills, work, leisure,
> health and safety (Criterion B). The onset must occur before age 18 years
> (Criterion C). Mental retardation has many different etiologies and may be

---

[11]The American Association for Mental Retardation is now the American Association
for Individuals with Developmental Disabilities (AAIDD).

11

seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.

*Chase*, 873 So. 2d at 1028 (citing Diagnostic and Statistical Manual of Mental Disorders[12] 39 (4th ed. 2000)).

¶22.    In *Foster v. State*, 848 So. 2d 172, 175 (Miss. 2003), this Court adopted these definitions and further held that "the Minnesota Multiphasic Personality Inventory-II (MMPI-II) is to be administered since its associated validity scales make the test best suited to detect malingering . . . ."  In *Chase*, we clarified this statement, "stating that the expert should use the MMPI-II, and/or any other tests and procedures permitted under the Mississippi Rules of Evidence, and deemed necessary to assist the expert and the trial court in forming an opinion as to whether the defendant is malingering." *Chase*, 873 So. 2d at 1028 n.19.

¶23.    In *Chase*, this Court held that no defendant can be adjudged mentally retarded under the Eighth Amendment unless the defendant produces an expert who testifies that:

> 1. The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or the American Psychiatric Association;
>
> 2. The defendant has completed the Minnesota Multi phasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.

*Chase*, 873 So. 2d at 1029.

---

[12]The Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), published by the APA, sets forth this diagnostic criteria for mental retardation.

12

¶24.    In ***Chase***, this Court explained that the DSM-IV provides that "'mild' mental retardation is typically used to describe persons with an IQ level of 50-55 to approximately 70." ***Chase***, 873 So. 2d at 1028 n.18. Accordingly, we note that the cutoff for mild mental retardation is an IQ of 70, which is two standard deviations of 15 points below the mean of 100, as measured by the Wechsler Adult Intelligence Scale. *See **Atkins***, 536 U.S. at 309 n.5; ***Bowling v. Commonwealth of Kentucky***, 163 S.W.3d 361, 374-75 (Ky. 2005) (informing that the Wechsler Adult Intelligence Scale (3rd. ed.) defines significantly subaverage intellectual functioning as . . . two or more standard deviations below the mean).

¶25.    In ***Chase***, this Court noted further that "mental retardation may, under certain conditions, be present in an individual with an IQ of up to 75" if this individual "exhibit[s] significant deficits in adaptive behavior." ***Chase***, 873 So. 2d at 1028, 1028 n.18. Therefore, if a defendant proves by a preponderance of the evidence that his or her IQ falls at or below the cutoff for mild mental retardation,[13] the trial court should also consider the remaining *Atkins* prongs when reaching an ultimate determination regarding mental retardation. ***Id.***[14]

---

[13]IQ tests typically have a standard error of measurement (also called a "confidence interval"). Accordingly, a base IQ score actually represents a range that could be five points higher or lower. Thus, despite the fact that 70 is the typical cutoff for mental retardation, the psychology profession accepts 75 as a qualifying score for a diagnosis of mental retardation. *See* DSM–IV–TR at 41–42. Of course, the defendant with an IQ of 75 or below must satisfy the remaining *Atkins* prongs. *See **Chase***, 873 So. 2d at 1028 n.18.

[14]For the sake of clarity, we note that the evidence sufficient to warrant the granting of an evidentiary hearing under *Atkins* in no way permeates the trial judge's testing and weighing of the evidence presented at the actual *Atkins* hearing. *See **Bell v. State***, ___ So. 3d ___, 2011 WL 322413, at *3 (¶11) (Miss. Feb. 3, 2011) (noting that evidence presented by the defendant's experts in support of this Court's grant of an *Atkins* hearing could be further tested at the actual hearing).

In ***Chase***, this Court set forth the requirements a defendant must meet to have an **evidentiary hearing**: "(1) the defendant has a combined . . . [IQ] of 75 or below, and; (2)

13

¶26. This Court also explained that any defense expert addressing whether a defendant meets the requirements of *Atkins* "must be a licensed psychologist or psychiatrist, qualified as an expert in the field of assessing mental retardation, and further qualified as an expert in the administration and interpretation of tests, and in the evaluation of persons, for purposes of determining mental retardation." *Chase*, 873 So. 2d at 1029.

¶27. Ultimately, to prove mental retardation, a defendant must show by a preponderance of the evidence that (1) he has significantly subaverage intellectual functioning (2) he has deficits in two or more adaptive skills; (3) he was eighteen or younger when the retardation manifested itself; and (4) he is not malingering. *Id.* at 1027-29.

> **I. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN PERMITTING DR. MacVAUGH AND DR. McMICHAEL TO OFFER EXPERT TESTIMONY FOR THE STATE RELATED TO THE ASSESSMENT OR DIAGNOSIS OF MENTAL RETARDATION.**

¶28. The trial judge declared Dr. MacVaugh to be an expert in forensic psychology with a particular emphasis in *Atkins* determinations and Dr. McMichael to be an expert in the field of forensic psychology. Thorson contends that the trial court abused its discretion by allowing Dr. MacVaugh and Dr. McMichael to testify. Specifically, Thorson argues that Dr. MacVaugh's and Dr. McMichael's backgrounds, training, and experience do not qualify them as experts under *Chase*, and allowing them to testify would render the *Atkins* decision illusory.

---

in the opinion of the expert, there is a reasonable basis to believe that, upon further testing, the defendant will be found to be mentally retarded, as defined herein." *Chase*, 873 So. 2d at 1029. The requirements for proving that one is entitled to an evidentiary hearing differ from the actual requirements of proving mental retardation to a trial court.

14

¶29. In support of this argument, Thorson argues that Dr. MacVaugh was admitted only as an expert in forensic psychology and that Dr. MacVaugh admitted that he was self-educated on *Atkins*. Thorson also points out that Dr. MacVaugh is not board-certified and argues that he has insufficient experience, focusing his practice solely on forensic psychology and having "only personally examined 'probably a hundred' individuals to determine whether or not they are mentally retarded, much of which was done in his doctorate and post-doctorate training." Moreover, Thorson contends that Dr. MacVaugh has assessed individuals for mental retardation only twenty-five times in the last four years, which is obviously insufficient.

¶30. Thorson also argues that Dr. McMichael was improperly qualified to testify as an expert under *Chase*, which requires qualification "as an expert in the field of assessing mental retardation . . . [and] in the administration and interpretation of tests . . . ." *See Chase*, 873 So. 2d at 1029. Thorson points out that Dr. McMichael candidly admitted that he neither administers nor interprets results for the purpose of diagnosing patients as mentally retarded and that he has not done many evaluations for the sole purpose of determining mental retardation.

¶31. The State argues that Thorson waived any objections to both of the State's experts because Thorson did not object to the trial court's expert certification of either Dr. MacVaugh or Dr. McMichael. The State argues that "[h]eightened appellate scrutiny in death penalty cases does not require abandonment of our contemporaneous objection rule which applies with equal force to death cases." *See Scott v. State*, 878 So. 2d 933, 953 (Miss. 2004), *overruled on other grounds by Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008).

15

¶32. Alternatively, the State argues that Dr. MacVaugh was properly qualified as an expert. In support of this argument, the State cites *Doss v. State*, 19 So. 3d 690 (Miss. 2009), and *Wiley v. Epps*, 668 F. Supp. 2d 848 (N.D. Miss. 2009), in which Dr. MacVaugh was certified as an expert. The State argues that Dr. MacVaugh's experience – performing hundreds of assessments – not only makes him qualified to assess mental retardation in a clinical context, but also makes him uniquely qualified to assess mental retardation in individuals on death row. Additionally, the State argues that Dr. McMichael, Service Chief of the Forensic Services Unit at the Mississippi State Hospital, was correctly qualified to testify under *Atkins*. The State contends that Dr. McMichael is a licensed forensic psychiatrist.

¶33. This Court finds that the trial court did not abuse its discretion by permitting Dr. MacVaugh and Dr. McMichael to testify as experts. The record reveals that Thorson failed to object to the State's experts. This Court has held that "[i]n death penalty cases, the contemporaneous objection rule is applicable," despite the heightened standard of appellate review. *Williams v. State*, 684 So. 2d 1179, 1203 (Miss. 1996).

> **II.** **WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY NOT RELYING ON DR. SWANSON'S AND DR. ZIMMERMAN'S EXPERT ASSESSMENTS AND DIAGNOSES OF MENTAL RETARDATION.**[15]

---

[15] Appellant's Issue IX is included under this section: Whether the trial judge abused his discretion by rejecting Dr. Swanson's clinical judgment. Issue IX is essentially the same as Issue II. Thorson argues that the trial court erred by failing to rely on Dr. Swanson's clinical judgment, which the AAIDD defines as "a special type of judgment that emerges directly from extensive data and is rooted in a high level of clinical experience . . . ." *See* AAIDD, User's Guide: Mental Retardation – Definition, Classification, and Systems of Supports (10th ed. 2007). Basically, Thorson argues that Dr. Swanson was the only expert qualified to provide reliable clinical judgment and the trial court abused its discretion by finding the State's experts to be more persuasive.

¶34. In its Order, the trial court found that Thorson had failed to prove mental retardation by a preponderance of the evidence. Thorson now argues that the trial court abused its discretion by not relying on Thorson's more experienced experts who testified that Thorson suffered from mild mental retardation.

¶35. In support of this argument, Thorson describes his experts' credentials. Thorson points out that Dr. Zimmerman has had extensive experience in testing individuals for mental retardation as part of his clinical practice, having, *inter alia*, been responsible for assessing individuals to determine whether they were qualified for admission into the Lufkin State School in Texas. Dr. Zimmerman also has tested hundreds, if not thousands, of individuals for mental retardation and has been qualified as an expert in several states. Thorson also points out that Dr. Swanson, a clinical psychologist, testified for Thorson. Dr. Swanson is eminently qualified, having assessed and tested "thousands and thousands" of people for mental retardation since 1973. Dr. Swanson ultimately testified that, with a reasonable degree of medical certainty, she believed Thorson is mentally retarded under *Atkins*.

¶36. This Court finds that Thorson's argument is misplaced. Thorson cannot show that the trial court abused its discretion simply because Thorson's two experts are vastly experienced in assessing mental retardation. This Court has never rubber-stamped the opinions of experts simply because the experts are experienced. *See* Miss. R. Evid. 702; *see also **Edmonds v. State***, 955 So. 2d 787, 791 (Miss. 2007) (excluding the testimony of a qualified expert's testimony and explaining that "a court should not give such an expert carte blanche to proffer any opinion he chooses").

17

### III. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY ACCEPTING DR. MacVAUGH'S AND Dr. McMICHAEL's DETERMINATION THAT THORSON DOES NOT EXHIBIT SIGNIFICANTLY SUBAVERAGE INTELLECTUAL FUNCTIONING AND BY REJECTING DR. SWANSON'S AND DR. ZIMMERMAN'S CONTRARY DETERMINATIONS.

¶37. Relying on the testimony of Dr. McMichael and Dr. MacVaugh, the trial court found that Thorson did not exhibit significantly subaverage intellectual functioning. Thorson contends that the trial court committed clear error by relying on the State's experts' findings, as opposed to Thorson's experts' findings.

¶38. Thorson argues that Dr. MacVaugh administered no tests to determine Thorson's level of intellectual functioning. Instead, six doctoral-level students performed most of the substantive work that Dr. MacVaugh relied upon in forming his expert opinion that Thorson is not mentally retarded. Dr. Robert Storer, a post-doctoral psychologist, administered the IQ test upon which Dr. MacVaugh based his expert report. Thorson argues that the State "should not be allowed to bootstrap potentially unscientific or improper testing performed by a potentially unqualified, and absent, witness by allowing another witness to 'rely' on the work of the absent witness." Thorson also points out that Dr. McMichael candidly admitted that he does not administer or interpret IQ tests.

¶39. Moreover, Thorson argues that, even assuming Dr. MacVaugh's reliance on the work of others in reaching his conclusions comports with the APA and the AAIDD, then the Full-Scale IQ (FSIQ) of 79 that resulted from the State's IQ testing of Thorson should be reported with a confidence interval of between 75 and 83, without applying the Flynn Effect and the

18

tree-stump effect.[16] Dr. Swanson explained in her report and testified that "all the AMR [sic] editions that we've discussed and the DSM pay particular attention to the standard error of measurement . . . . They ask you to look at the standard error of measurement or the confidence interval around that score" which is "plus or minus five" points. Accordingly, considering this confidence interval, Thorson contends that he has satisfied the first prong under *Atkins*, an IQ of 75 or below, and argues that the trial court's reliance on Dr. MacVaugh's finding that Thorson did not have subaverage intellectual functioning was clearly erroneous given Dr. MacVaugh's methodology.

¶40. Pointing to his own experts' findings, Thorson continues to argue that the trial court abused its discretion in finding that Thorson did not have subaverage intellectual functioning. He points out that Dr. Zimmerman's personally conducted IQ test[17] of Thorson, which scored 70, was consistent with mental retardation. Dr. Zimmerman found that Thorson was not malingering[18] and ultimately concluded that, based on thirty years of experience, Thorson was mentally retarded.

¶41. Thorson continues, providing that Dr. Swanson determined, based on her extensive review of Thorson, that Thorson's full-scale IQ was probably around 71 or 72 and that Thorson had not been malingering. Dr. Swanson did not personally perform an IQ test but

---

[16]This Court will address later the Flynn Effect and the tree-stump effect.

[17]Dr. Zimmerman conducted the Wechsler Adult Intelligence Scale Three, the Test of Memory Malingering, the Short Category Test, the Wisconsin Card Sort, the Screening Test for the Luria-Nebraska Neuropsychological Battery, the full Luria Neuropsychological Battery, the Wide Range Achievement, and the Benton Visual Retention Test and malingering tests. All of these tests were consistent with mental retardation.

[18]None of the experts found evidence to prove that Thorson was malingering.

reviewed IQ tests conducted by Dr. Gasparrini in 1988, by Dr. Zimmerman in 2005, and at Whitfield in 2008. She also testified that Thorson's intellectual development "topped off" somewhere around the sixth grade, consistent with mild mental retardation, and that Thorson was still functioning at that sixth-grade level.

¶42. In contrast, the State argues that the trial court did not abuse its discretion by relying on the expert testimony of Dr. MacVaugh. The State argues that Thorson did not object to the fact that the Whitfield doctors administered the tests to Thorson, and, therefore, Thorson's claim is without merit. Alternatively, the State argues that Dr. MacVaugh evaluated Thorson on August 25, 2008, and found him not to be mentally retarded. The team of six doctoral-level forensic clinicians/students at Whitfield conducted the assessment of Thorson, reviewing Thorson's available records,[19] psychological testing, and a clinical interview. Dr. MacVaugh also reviewed two reports submitted by Dr. Swanson as well as her raw data. Dr. MacVaugh testified that Thorson "scored a 29 out of 30" on a cognitive screening instrument which "suggests normal range of cognitive functioning." He also testified that Thorson was not malingering and that he had achieved a full-scale IQ of 79 on the WAIS-III.

¶43. The State adds that Dr. MacVaugh also reviewed Thorson's report cards from first grade through his sophomore year at Ocean Springs High School. According to the State, these progress reports indicated that Thorson did not apply himself in school. The State also provided a copy of Thorson's General Educational Development Test (GED) or High School Equivalency Diploma. In addition, the State pointed out that Dr. MacVaugh's IQ score of 79

[19]The Whitfield team reviewed 309 documents.

20

was within two points of Dr. Gasparrini's 1988 score of 77, despite the fact that these scores were achieved on two different editions of a test, administered decades apart.

¶44.    Dr. McMichael testified that Thorson failed to meet the first *Atkins* prong because Thorson did not have a sufficiently low IQ. He testified that Thorson's word choice in his videotaped statement was not consistent with someone who was mentally retarded.

¶45.    Having considered the record, we find the trial court did not abuse its discretion by relying on the testimony of the State's experts and finding that Thorson does not have an IQ of 75 or below. Although Dr. MacVaugh did not personally administer the IQ test to Thorson, the test was administered by a post-doctoral psychologist, present in the courtroom on the day of the hearing. Thorson did not object to Dr. MacVaugh's testimony before the trial court, and even assuming that Thorson had made a contemporaneous objection, Mississippi Rule of Evidence 703 permits experts to base their opinions on evidence not in the record so long as experts in the field ordinarily rely on such opinions in forming their opinions. Here, all of the IQ tests performed on Thorson were submitted into evidence and subject to cross-examination. Both Dr. MacVaugh and Dr. Swanson relied on IQ tests performed by other psychologists in reaching their opinions. This argument is without merit.

¶46.    Moreover, the trial judge had ample evidence before him in the form of two IQ tests above 75 to determine that Thorson was not mentally retarded. Although the margin of error or confidence interval in Dr. MacVaugh's IQ test of 79 was 75-83, we find that the trial court committed no error by not picking the low end of an error margin to serve as a basis for finding that Thorson had proven mental retardation by a preponderance of the evidence, especially in light of the other IQ test score above 75. As Dr. MacVaugh stated, "[I]t's a little

21

intellectually dishonest to do that because you don't interpret a score only as existing in the low end of the confidence interval." Moreover, *Chase* does not provide that the defendant's IQ may fall within an error margin of mental retardation before the trial court considers the remaining *Atkins* factors. *Chase*, 873 So. 2d at 1028 n.18.

¶47. Accordingly, because of the varying IQ tests and the fact that Thorson had the burden of proof, we find that Thorson did not prove by a preponderance of the evidence that he has significantly subaverage intellectual functioning. Of course, this argument presupposes that the trial court did not abuse its discretion by not applying margins of error to the IQ tests, which is the next issue this Court will address.

      **IV.    WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY NOT APPLYING ERRORS OF MEASUREMENT FOR THE ASSESSMENT OF SIGNIFICANTLY SUBAVERAGE INTELLECTUAL FUNCTIONING.**

¶48.   As stated, the trial court found that Thorson had not proven significantly subaverage intellectual functioning.  The trial court, however, did not apply the Flynn Effect[20] or the tree-stump effect,[21] which would have lowered the IQ scores.  The Flynn Effect

> is the name in recognition of the central role played by Professor James R. Flynn in discovering and, in a series of fifteen or more publications between 1984 and today, documenting the fact that IQ scores have been increasing in one generation to the next in all fourteen nations for which IQ data is available . . . .
>
> For the Wechsler (WISC and WAIS) and the Stanford-Binet IQ tests, the best rule of thumb is that Full Scale IQ gains have been proceeding at a rate of 0.30 points per year ever since 1947. This rate is based on comparisons of all the Wechsler and Standford-Binet tests used in recent years . . . .  It means that for every year the test passes between when an IQ test was normed, that is, when its standardization sample was tested, obsolescence has inflated their IQs by 0.30 points.

*Allen*, 614 F. Supp. 2d at 1275.

---

[20]Several courts have addressed the extent to which a trial court should consider, if at all, the Flynn Effect. *See* **Sasser v. Hobbs**, 751 F. Supp. 2d 1063, 1082 n.15, (W.D. Ark. 2010) (citing **Thomas v. Allen**, 614 F. Supp. 2d 1257 (N.D. Ala. 2009) (holding that "[a] court must consider the Flynn Effect and the standard error of measurement in determining whether a petitioner's IQ score falls within a range containing scores that are less than" seventy); **Walker v. True**, 399 F.3d 315, 322-23 (4th Cir. 2005) (vacating district court's opinion which dismissed the habeas petition, and remanding for consideration of "relevant evidence, namely  Flynn Effect evidence"); **In re Mathis**, 483 F.3d 395, 398 n.1 (5th Cir. 2007) (refusing to recognize one way or the other whether or not the Flynn Effect is scientifically valid); **Bowling v. Commonwealth**, 163 S.W.3d 361, 374-75 (Ky. 2005) (noting that because the Kentucky statute unambiguously sets IQ score of 70 as cutoff, courts cannot consider the Flynn Effect or standard error of measurement)).

[21]According to Dr. Swanson, the tree-stump phenomenon is specific to the WAIS-III, which possibly included "too many low functioning people in the normative sample at the lower end. So what we found is you could give the test to somebody, [and] [he or she] would miss every item and . . . still score in the 40's. So that's what the tree-stump means. A tree-stump could make the same IQ as a person that you administered it to. This had an effect in elevating the scores . . . ."

¶49.    The trial court considered these phenomena in its Order; however, in finding these tests to be unpersuasive, the trial court stated:

> The tests administered to Thorson are accepted as standard recognized testing which meet the testing standards required by ***Chase***. There was some controversy over the application of "the Flynn Effect" and the "tree stump effect" which would require adjusting the I.Q. scores. All experts agreed that I.Q. scores are adjusted under certain circumstances . . . and that an I.Q. score is not exact . . . .

¶50.    Thorson now argues on appeal that the trial court abused its discretion by not applying the Flynn Effect or the tree-stump effect to lower Thorson's IQ score. Thorson points out that Dr. Swanson testified that failure to take the Flynn Effect into account results in an artificially high IQ score. Dr. Swanson wrote in her expert report that "[t]he Flynn Effect is generally accepted in the scientific community and experts in the field of mental retardation recommend that both the obtained and Flynn-adjusted IQ scores be reported in ***Atkins***-related cases." Moreover, Thorson states that the AAIDD recognizes the Flynn Effect as necessary for reliability, particularly when conducting retrospective diagnoses, "when the individual with mental retardation did not receive an official diagnosis of mental retardation during the developmental period."

¶51.    According to Dr. Swanson, Thorson's IQ is likely 71 or 72, applying these adjustments to Thorson's varying IQ scores. Dr. Swanson's report stated,

> taking into account the Flynn Effect and the confidence interval for the three tests . . . Mr. Thorson's three Flynn-adjusted Full Scale IC (FSIQ) scores – including the test conducted by the State – fall somewhere between 64 and 72 (FSIQ, 67, 2005) and 71 and 80  (FSIQ, 75; 2008) at the 95% confidence interval. As noted above, the confidence interval is the probability the obtained score (FSIQ) reflects his true score . . . . A comparison across the three confidence intervals indicates there is an obvious overlap at 71 to 72.

24

63  64  65  66  67  68  69  70  **71**  **72**  73  74  75  76  77  78  79  80  81
1988 WAIS-R (FSIQ–74) Dr. Gasparrini

63  64  65  66  67  68  69  70  **71**  **72**  73  74  75  76  77  78  79  80  81
2005-WAIS-III (FSIQ–67) Dr. Zimmerman

63  64  65  66  67  68  69  70  **71**  **72**  73  74  75  76  77  78  79  80  81
2008-WAIS-III (FSIQ–75) State Hospital

¶52.    Thorson also points out that Dr. MacVaugh, in his report, applied the Flynn Effect and incorrectly stated that the IQ cutoff was 70 for mental retardation, as opposed to 75. Dr. MacVaugh wrote in his report that

> Mr. Thorson's true IQ score would likely fall somewhere between 75 and 83. However, because IQ scores become artificially inflated as the test becomes outdated (i.e., "Flynn Effect"), Mr. Thorson's IQ score should be modified to account for test obsolescence. After adjusting for the Flynn Effect (.3 points per year) . . . Mr. Thorson's Full Scale IQ score of 79 should be reduced by four points, which places his Full Scale IQ score at 75 . . . Nevertheless, Mr. Thorson's IQ score is still above the cutoff for mental retardation (i.e., approximately 70 or below).

¶53.    In contrast, the State argues that the trial court heard evidence from both parties concerning standard errors of measure and considered them when making its conclusions. The State cites Dr. MacVaugh's testimony[22] that the Flynn Effect is a "statistical phenomenon" and that considerable controversy exists regarding its application in this context:

---

[22] In his appellate brief and at the hearing, Thorson mentioned *Wiley v. Epps*, 668 F. Supp. 2d 848, 894 (N.D. Miss. 2009), in which Dr. MacVaugh stated that "the Flynn Effect is generally accepted in the psychological community and must be taken into consideration in interpreting Petitioner's full-scale IQ." Thorson also questioned Dr. MacVaugh on cross-examination about an academic article in which Dr. MacVaugh stated that "the Flynn Effect has gained sufficient scientific acceptance that this factor should be described in *Atkins* assessments and that Flynn-corrected IQ scores . . . should be reported in addition to the observed scores."

Q.    Yes, sir. Well, the Flynn Effect is something that you have looked into and you're well familiar with, correct?

A.    I am.

Q.    That is – – it is not universally accepted in the field at this time, is it?

A.    I think the Flynn Effect is generally accepted in the scientific community. I think what is more controversial is whether or not adjustments should be made to individual scores. The research looks at group means, that is the overall scores that tend to increase over time based on the instrument, not a particular individual's score.

Q.    All right, sir. So in other words, to automatically assume that each individual test – IQ test should be reduced by what is known as the Flynn Effect has not been universally accepted in the field?

A.    It has not.

Dr. McMichael also testified, stating that, to his knowledge, the publisher of the WAIS-III (the IQ test administered to Thorson) does not endorse the recommendation to modify the WAIS-III scores to correct for the Flynn Effect.

¶54.    This Court finds that Dr. MacVaugh was correct in his statement that the cutoff for mild mental retardation is 70. *See* **Chase**, 873 So. 2d at 1028 (stating that "'mild' mental retardation is typically used to describe persons with an IQ level of 50-55 to approximately 70"). However, in **Chase**, importantly, this Court also recognized that, according to the DSM-IV, "'it is possible to diagnose Mental Retardation in individuals with IQ's between 70 and 75 who exhibit significant deficits in adaptive behavior.'" **Id.** at 1028 n.18. Accordingly, if the defendant establishes by a preponderance of the evidence that his or her IQ is 75 or below, then the trial court must address the second **Atkins** prong – deficits in adaptive functioning.

¶55.     We cannot say that the trial court abused its discretion by finding that Thorson did not have an IQ of 75 or below, despite the Flynn Effect or the tree-stump effect.[23] The trial court heard conflicting testimony as to the soundness of applying these phenomena in this context. Moreover, this Court has not explicitly adopted or rejected the Flynn Effect or the tree-stump effect. We also need not address the veracity of the Flynn Effect or the tree-stump effect under our rules of evidence today, as neither party objected to the trial court considering these phenomena.

¶56.     In light of the conflicting expert testimony surrounding the Flynn Effect and the fact that this Court has neither adopted nor rejected this effect, this Court cannot say that the trial court committed clear error. The trial judge's Order indicates that he considered both the Flynn Effect and the tree-stump effect, as presented by the experts, but found them unpersuasive under the facts of this case.

## CONCLUSION

¶57.     Based on today's discussion, we find that Thorson failed to prove significantly subaverage intellectual functioning by a preponderance of the evidence under *Atkins*. We agree that the trial court's factual findings were not clearly erroneous and find that Thorson failed to meet his burden of proof at the evidentiary hearing. The trial court had before it two IQ scores over the requisite minimum for continuing to test the defendant under *Atkins*. Therefore, the trial court did not have to address the remaining *Atkins* prongs. Because of

---

[23]Dr. MacVaugh also testified at trial that the tree-stump effect was a statistical phenomenon and that he was "not quite convinced yet that individual scores should be adjusted because of the tree-stump effect . . . ."

our disposition on the issues discussed, we need not discuss the remaining issues raised by Thorson.

¶58.    Thus, the trial court's denial of Roger Eric Thorson's petition for post-conviction relief is affirmed.

¶59.    **AFFIRMED**.

**WALLER, C.J., DICKINSON, P.J., RANDOLPH, LAMAR, KITCHENS, CHANDLER, PIERCE AND KING, JJ., CONCUR.**