# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-KA-00245-SCT

*STATE OF MISSISSIPPI*

*v.*

*WILLIE C. RUSSELL A/K/A WILLIE RUSSELL*
*A/K/A WILLIAM C. RUSSELL*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/30/2014 |
| TRIAL JUDGE: | HON. BETTY W. SANDERS |
| TRIAL COURT ATTORNEYS: | MARVIN L. WHITE, JR. |
| | JASON L. DAVIS |
| | CAMERON LEIGH BENTON |
| | RICHARD JOHN BOURKE |
| | DAVID PAUL VOISIN |
| COURT FROM WHICH APPEALED: | SUNFLOWER COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LADONNA C. HOLLAND |
| ATTORNEYS FOR APPELLEE: | RICHARD JOHN BOURKE |
| | DAVID PAUL VOISIN |
| NATURE OF THE CASE: | CIVIL - POST-CONVICTION RELIEF |
| DISPOSITION: | REVERSED AND REMANDED - 12/14/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1.     A jury sentenced Willie C. Russell to death for murdering a correctional officer.

Russell later claimed he was intellectually disabled and thus could not be executed under

*Atkins v. Virginia*.[1]  In 2014, the trial court set an *Atkins* hearing to determine if Russell was

---

[1] *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

intellectually disabled.

¶2.     Prior to the hearing, the State moved to assess Russell based on his claimed intellectual disability.  But Russell was opposed to the State's expert conducting an *Atkins* evaluation.  Years earlier, in 2006, Russell had undergone psychological testing ordered in a separate aggravated-assault case.  But that testing was for his competency to stand trial—not assessing intellectual disability.  Although the State had initially proposed that the 2006 assessment cover both issues, Russell's attorney also objected back then to the State evaluating Russell's *Atkins* claim in that proceeding.  So Russell was never evaluated on the specific criteria for intellectual disability under *Atkins*.

¶3.     Furthermore, the record shows both Russell and the State understood that the 2006 testing *would not* serve as his complete *Atkins* assessment.  And, indeed, according to the State's expert, additional testing was required.  Still, the trial court denied the State's motion to evaluate Russell, concluding the prior testing was sufficient.  Consequently, the court's denial led to what was essentially a one-sided *Atkins* hearing.

¶4.     At the end of the hearing—at which Russell's expert testified—the trial court ruled that Russell was intellectually disabled under *Atkins* and *Chase*[2] and vacated his death sentence.  The State has appealed.  After review, we find the trial court reversibly erred.  While *Atkins* determinations are legal decisions, they are decisions that must be informed by medical experts.[3]  And here, we find the trial judge abused her discretion by denying the

---

[2] *Chase v. State*, 873 So. 2d 1013, 1027-28 (Miss. 2004).

[3] *Hall v. Florida*, 134 S. Ct. 1986, 2000, 188 L. Ed. 2d 1007 (2014).

State's well-supported motion to evaluate Russell prior to the *Atkins* hearing.

¶5. We reverse the order vacating Russell's death sentence. And we remand this matter to the trial court with instructions that the State's expert be permitted to evaluate Russell before the *Atkins* hearing.

### Background Facts and Procedural History

### I. Capital-Murder Conviction and Death Sentence

¶6. In 1989, while an inmate at the State Penitentiary at Parchman, Russell stabbed and killed a corrections officer. A jury convicted Russell of capital murder and sentenced him to death. On appeal, this Court affirmed his conviction but vacated his death sentence and remanded for resentencing. *Russell v. State*, 607 So. 2d 1107 (Miss. 1992) (*Russell I*). On remand, Russell once again was sentenced to death. And this Court affirmed. *Russell v. State*, 670 So. 2d 816 (Miss. 1995) (*Russell II*).

¶7. Russell filed for post-conviction relief (PCR). In 2002, while his petition was still pending, the United States Supreme Court handed down *Atkins*, holding that, based on "evolving standards of decency," imposing the death penalty on intellectually disabled persons violates the Eighth Amendment. *Atkins*, 536 U.S. at 321, 122 S. Ct. at 2252. This Court granted Russell permission to amend his PCR petition to include the claim that he is intellectually disabled and thus, under *Atkins*, cannot be executed. This Court granted Russell's PCR petition in part, granting him leave to proceed in the trial court with his *Atkins* claim. *Russell v. State*, 849 So. 2d 95, 149 (Miss. 2003) (*Russell IV*).

### II. Aggravated-Assault Charge

3

¶8.    At the time his *Atkins* petition was granted, Russell was facing a separate charge of aggravated assault. While on death row, Russell had shot at another corrections officer with a homemade "zip gun." As part of his defense to this charge, Russell asserted that he was incompetent to voluntarily confess and stand trial. He also claimed he was insane at the time he shot at the corrections officer.

¶9.    Because of the pending *Atkins* issue, Russell asked that his aggravated-assault trial be stayed. But by 2006, three years had passed without Russell pursuing his *Atkins* claim. At this point, a different trial judge presiding over the assault case refused to let that charge linger on the docket any longer. The assault trial would move forward, with or without the *Atkins* issue being resolved.

¶10.   The State initially suggested evaluating both Russell's *Atkins* claim and his mental-health-related defenses in the aggravated-assault case at the same time. And the original evaluation order included a directive to assess Russell's *Atkins* claim. But Russell opposed proceeding in this manner. Instead, he argued that the judge who was presiding over his aggravated-assault trial—a different judge than the one handling the *Atkins* claim—had no authority over the *Atkins* claim raised in his separate capital-murder case. The trial court succumbed to his request and struck that portion of its order.

¶11.   As a result, the State Hospital did not assess whether Russell had an intellectual disability preventing the State from executing him. Page one of the 2006 case report notes the order to evaluate Russell's *Atkins* claim was vacated. And in the transcript of Russell's 2006 clinical interview, his counsel agreed "[t]his isn't going to be a complete *Atkins*

4

assessment."

¶12.    Russell did, however, participate in a clinical interview by Dr. Reb McMichael, Dr. Gilbert Macvaugh III, and Dr. Criss Lott.  And he underwent three psychological tests—the Wechsler Adult Intelligence Scale - 3rd Edition (WAIS-III), the Wide Range Achievement Test, 4th Edition (WRAT-4), and the Green's Word Memory Test (WMT).  Dr. McMichael also reviewed extensive records to compile the 2006 State Hospital's report.  Dr. McMichael testified during the aggravated-assault trial that Russell was competent to confess voluntarily and to stand trial and was not insane at the time he shot at the corrections officer.  Dr. McMichael also offered his unsolicited opinion that Russell was not intellectually disabled, based on the 2006 evaluation.

### III.    Motion to Evaluate

¶13.    In 2010, Russell finally filed his *Atkins* petition with the trial court.  After reviewing the State Hospital records from Russell's 2006 assessment, which clearly indicated Russell's *Atkins* assessment had yet to occur, the State moved to evaluate Russell on his *Atkins* claim.  Russell objected.  Russell's counsel represented to the trial judge—again, a different judge than the one presiding over the aggravated-assault charge—that Russell only agreed to be evaluated in 2006 with the express understanding he would not be tested any further.

¶14.    The trial court held a hearing, during which the State called Dr. Macvaugh, its designated *Atkins* expert.[4]  Dr. Macvaugh, a participant in the 2006 evaluation, testified that he recalled cautioning Russell and Russell's counsel that any data collected in the

_____

[4] Since the 2006 evaluation of Russell for the aggravated-assault case, Dr. Macvaugh had left his employment at the State Hospital and gone into private practice.

5

aggravated-assault evaluation *could* be used in a future *Atkins* assessment. But there was never any agreement Russell would not be further tested. Indeed, in the transcript from the 2006 clinical interview, Russell's counsel had conceded the evaluation would not be a full *Atkins* assessment and objected only to Russell "being given the same test batteries twice in the course of the next year or anything like that."

¶15. Dr. Macvaugh further testified that "additional intellectual assessment is needed, additional adaptive assessment is needed, and additional malingering assessment is needed, . . . in order to offer an opinion to a reasonable degree of psychological certainty as to whether or not Mr. Russell has mental retardation pursuant to *Atkins*." Specifically, Dr. Macvaugh wanted to administer the most up-to-date Wechsler Adult Intelligence Scale— the WAIS IV—because it incorporates significant developments in the field since the WAIS III. Dr. Macvaugh also planned to test Russell for adaptive-functioning deficits—something he and his colleagues did not assess in 2006. But beyond that, he explained he was ethically and professionally bound not to go into more specifics about what tests he might administer. In particular, divulging beforehand to Russell's counsel what tests were to be administered could affect the validity of the test results. It could also box Dr. Macvaugh in to administering certain instruments, even though he might later determine, in his professional opinion, other tests would be better.

¶16. On cross-examination, Dr. Macvaugh was pressed as to why, in contrast to Dr. McMichael, he could not simply rely on the 2006 data to form an expert opinion. Dr. Macvaugh responded that he disagreed with Dr. McMichael that the prior testing was

sufficient to form an opinion on intellectual disability when that issue is raised in a death-penalty case. He further explained "[i]t doesn't make clinical, forensic, or ethical sense to me to not want more, better data when the stakes are as high as they are."

¶17. Though the trial court's order acknowledged Russell had agreed that the 2006 evaluation would not be a complete *Atkins* assessment, the judge nonetheless decided no further testing was needed to form an expert *Atkins* opinion. In particular, the trial court was swayed by Dr. McMichael's opinion given in the non-death-penalty case and the fact Dr. Macvaugh would not divulge specifically what tests he planned to administer. The trial court treated the State's motion as one for a "subsequent exam." And the court ruled the State had not shown good cause to administer any further tests. Instead, "[t]o permit the State's expert to examine Mr. Russell a second time would be to permit an unfair and unwarranted forensic advantage."

### IV.    *Atkins* Hearing

¶18. The trial court heard Russell's *Atkins* petition on September 8-9 and December 17, 2014. Russell presented three witness. First, he called Clementine Harrison, a volunteer investigator with the Louisiana Capital Assistance Center (LCAC) in 2007. Harrison testified she had investigated Russell's *Atkins* claim, collecting Russell's school records and witness statements.[5] Next, Russell called Anne Preziosi, a mitigation specialist with LCAC, to testify as an expert. But due to her lack of qualifications, she could only testify as a lay witness about the records and witness statements she collected. Finally, Russell's expert,

---

[5] The twenty witness statements she gathered were admitted into evidence over the State's objection.

clinical psychologist and neuropsychologist Dr. John Goff, testified. Dr. Goff concluded that Russell is intellectually disabled, based on Russell's prior IQ scores, his adaptive-functioning deficits, and his placement in special-education classes, indicating onset prior to age eighteen. Dr. Goff also opined Russell was not malingering. *See Chase*, 873 So. 2d at 1027-28 (setting forth the criteria for determining whether a criminal defendant is intellectually disabled for Eighth Amendment purposes).

¶19.    When Russell rested, the State announced it would not present any witnesses.[6] On December 31, 2014, the trial court entered an order vacating Russell's death sentence. And the State appealed.

## Discussion

¶20.    While the State raised three issues on appeal, we need focus on only one—the trial court's denial of its motion to evaluate Russell on his *Atkins* claim.[7]

¶21.    The State suggests this issue raises a purely legal question, requiring de novo review. But we review discovery matters, even in death-penalty PCRs, for abuse of discretion. *E.g., Brown v. State*, 88 So. 3d 726, 730 (Miss. 2012). That said, in this case, we find the trial court abused its discretion when it ruled the State had "adequate opportunity" and

---

[6] At a prior hearing on the State's motion to continue the *Atkins* hearing to a date when its expert, Dr. Macvaugh, was available, Russell's counsel had suggested there was no need for Dr. Macvaugh to testify any further, having already been clear that he lacked sufficient data to form an opinion to a reasonable degree of psychological certainty whether Russell was intellectually disabled under *Atkins*.

[7] The State also challenged the trial court's finding that Russell had proved by a preponderance of the evidence that he is intellectually disabled under *Atkins* and *Chase* and asserted "cumulative error" warranted reversal.

information to evaluate Russell's *Atkins* claim, because that ruling is not supported by the record.

¶22.   Instead, the record is clear that the State Hospital *did not* assess in 2006 whether Russell had an intellectual disability preventing the State from executing him.  The first page of the 2006 case report notes the order to evaluate Russell's *Atkins* claim was vacated.  And in the transcript of Russell's 2006 clinical interview, Russell's counsel agreed "[t]his isn't going to be a complete *Atkins* assessment."  Dr. Macvaugh, who participated in the 2006 assessment, confirmed this, testifying unequivocally that the State doctors were not ordered to and did not evaluate Russell's claim that he was intellectually disabled.

¶23.   Thus, contrary to the trial court's characterization, when the State moved in 2012 to evaluate Russell on his *Atkins* claim, it was not seeking a second, duplicate *Atkins* evaluation.  It was requesting *the Atkins* evaluation.[8]  The State made this request not to redo what had already been done or, as the trial court put it, to gain a "forensic advantage." Instead, it made this request at the behest of its expert.  According to Dr. Macvaugh—no stranger to *Atkins* and its requirements[9]—additional intellectual, adaptive, and malingering

---

[8] Again, Russell only objected in 2006 to "being given the same test batteries twice in the course of the next year or anything like that"—something not at issue here, as the State filed its request to evaluate Russell *six years later*.

[9] In addition to performing numerous *Atkins* evaluations and testifying as an expert in many *Atkins* hearings, Dr. Macvaugh was asked by the American Association for Intellectual and Developmental Disability (AAIDD), a leading advocacy group for the intellectually disabled, to contribute to its "death penalty manual." Dr. Macvaugh wrote two chapters for the manual, which serves as a guide to forensic psychologists assessing intellectual disability in the context of *Atkins*.  This Court has adopted the AAIDD's definition of intellectual disability for purposes of *Atkins* determinations.  *See Chase v. State*, 171 So. 3d 463, 469-70 (Miss. 2015).

assessments were necessary "in order to offer an opinion to a reasonable degree of psychological certainty as to whether or not Mr. Russell has mental retardation pursuant to *Atkins*."

¶24.    Despite this, the trial court ruled that Dr. Macvaugh had performed all the necessary testing to form an expert opinion, even though he testified that, in his *professional* opinion, more data was required. In other words, it was the trial judge—not the expert—who opined that no further assessment was necessary. As support, the trial court relied on the testimony given by Dr. Reb McMichael in Russell's aggravated-assault case that Russell was not intellectually disabled, based on the 2006 evaluations. But the only impact of this opinion was that it contributed to the trial court finding Russell was competent to stand trial on the assault charge. Significantly, Dr. McMichael's opinion had no bearing on whether Russell could be put to death. When the stakes were raised and the life-and-death question of Russell's intellectual ability to suffer execution was posed to Dr. Macvaugh, Dr. Macvaugh testified the 2006 evaluations *were not* sufficient to form an opinion to a reasonable degree of psychological certainty.

¶25.    When questioned by Russell's counsel on why he could not just use the 2006 data, as Dr. McMichael did in the assault case, Dr. Macvaugh replied, "It doesn't make clinical, forensic, or ethical sense to me to not want more, better data when the stakes are as high as they are." In other words, according to an *Atkins* expert, forming an expert opinion on intellectual disability is a much weightier task in the *Atkins* context, requiring more specific and better data.

10

¶26. While *Atkins* determinations are legal decisions, they are decisions that, according to the United States Supreme Court, must be informed by medical experts.[10] *Hall*, 134 S. Ct. at 2000, 188 L. Ed. 2d 1007 (acknowledging *Atkins* decisions require "substantial reliance on the expertise of the medical profession"). Here, instead of being informed by the medical expert on what assessments are necessary, it was the trial judge who informed the expert what assessments were sufficient. This was an abuse of discretion. In reaching this conclusion, the trial court not only improperly stepped into the role of a forensic psychologist, but it also broke with this Court's precedent recognizing that the medical expert is in the best position to determine what testing is sufficient to form an opinion on the petitioner's intellectual disability. *See, e.g., Lynch v. State*, 951 So. 2d 549, 556-57 (Miss. 2007) (abolishing this Court's prior mandatory requirement that the experts administer a specific test for malingering); *see also State v. Scott*, 2014-KA-00123-SCT, 2017 WL 2377563, at *6 (Miss. June 1, 2017) (clarifying that the expert must be given the freedom to chose the method he or she deems appropriate, in his or her expert view, to make an *Atkins* assessment).

¶27. In doing so, the trial judge placed the State in an impossible position. Dr. Macvaugh was adamant that, professionally and ethically, he could not form an opinion on Russell's *Atkins* claim without further assessment. But the trial court ruled no further assessment could take place. Instead, the State would have to rely on data its own expert deemed

---

[10] Indeed, in Mississippi, a petitioner cannot move forward with his *Atkins* claim unless he has produced expert testimony by a qualified licensed psychologist or psychiatrist that he meets the clinical definition of intellectually disabled. *Chase*, 873 So. 2d at 1029.

11

insufficient to support a critical determination as to whether Russell could be put to death. Thus, the State was placed in a position where it was unable to test, and possibly attempt to disprove through expert testimony, Russell's claim he could not be executed. Even Russell's counsel recognized this bind, essentially predicting the State would not call an expert in defense because Dr. Macvaugh had been so adamant that the 2006 evaluation was insufficient to form an expert opinion to a degree of reasonable psychological certainty on the Russell *Atkins* claim.[11] Because our *Atkins* procedures clearly contemplate the State responding to the petitioner's evidence with its own expert opinion,[12] the trial court abused its discretion when it restricted the State in this way.

### Conclusion

¶28. We reverse the order vacating Russell's death sentence and remand this matter to the trial court, with instructions that the State's expert be permitted to evaluate Russell prior to the *Atkins* hearing.

¶29. **REVERSED AND REMANDED.**

**RANDOLPH, P.J., BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. WALLER, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J., KING AND COLEMAN, JJ.**

**WALLER, CHIEF JUSTICE, DISSENTING:**

¶30. Because the record was adequate and sufficient for Russell's *Atkins* evaluation, the trial court did not abuse its discretion in denying the State's motion to have Russell subjected

---

[11] *See* n.6, *supra*.

[12] *See Chase*, 873 So. 2d at 1029.

12

to additional psychological testing by its privately retained expert. Accordingly, I respectfully dissent.

¶31. The majority contends that Russell conceded the need to undergo additional psychological testing by the State for an evaluation of his *Atkins* claim. *See* Maj. Op. at ¶¶ 3, 11, 14, 17, 22. At the time Russell's *Atkins* claim was remanded to the trial court, Russell was awaiting trial on an aggravated-assault charge in another case. In the course of those proceedings, Russell was ordered to undergo a mental evaluation at the State Hospital to assess his competency to waive his constitutional rights and his sanity at the time of the offense. The State, aware of Russell's *Atkins* claim, requested that Russell be evaluated one time for the purposes of both cases:

> [I]t would be judicially efficient and prudent for the safety of those who have to examine Defendant and transport him to said examination to have Defendant Russell examined at the Mississippi Hospital at Whitfield once rather than having to move him from maximum security twice. His alleged mental retardation is the basis for his motion to suppress as well as his pending status to be executed. Both issues will be before the Circuit Court of Sunflower County. The examination should determine if Defendant is mentally retarded, if this retardation, if such exist [sic], together with any other factors, rendered him incompetent to waive his constitutional rights, if the alleged mental retardation renders him incapable of being executed under Atkins, supra, and to determine his sanity at the time of the alleged offense.

Russell agreed to this procedure on the condition that, to the extent possible, the results of his mental evaluation in the assault case would serve the State's purposes for the *Atkins* claim and that he would not be subjected to additional testing.

¶32. Russell's first evaluation occurred on April 1, 2006. In preparing for the testing, Dr. Reb McMichael asked Russell's attorney whether the information obtained from Russell

13

could be used for his *Atkins* claim. Russell's attorney stated his understanding that the evaluations could be used to support or oppose Russell's pending *Atkins* claim. The majority then points out that Russell's attorney stated, "[t]his isn't going to be a complete *Atkins* assessment . . . ." *See* Maj. Op. at ¶¶ 11, 22. But a reading of the rest of this statement shows that it was no admission at all: ". . . but, to the extent that there's information obtained or history or what have you, that that's going to be . . . serve for the purposes of subsequent, the [*Atkins*] proceeding as well." At oral argument, in response to a question on this exact statement, Russell's attorney explained that he simply was acknowledging that additional sources of evidence would need to be collected to reach a determination on Russell's intellectual disability, specifically for adaptive functioning, which is largely based on secondary historical sources:

> We concentrated on conducting a detailed and thorough investigation of adaptive functioning. Dr. Goff went out and visited with eleven witnesses: three teachers, an employer or co-worker, neighbors, family members, people he had lived with, the aunts who had raised Mr. Russell. All of those persons were available to the State at all times. They could have gone and seen any of them. In fact, we provided in discovery their statements, four months before the hearing concluded in December. And the State chose to sit on its hands and not conduct any of that investigation. And so again, when the State complains that it has not had an opportunity to conduct an adaptive deficit assessment, that is a fault entirely of its own making. And Your Honor, I was referring in that interview with Dr. McMichael and Mr. Russell to the fact that this wouldn't be a complete *Atkins* evaluation, it was exactly that sort of thing that I had in mind – that they would have to go out into the community and do more for an *Atkins* evaluation. We weren't going to finish and have an *Atkins* report at the end of that interview.

Further, during the hearing on the State's motion for an evaluation, Russell's attorney gave this response to the State's request for additional testing:

14

> We have no problem with the State doing whatever other investigation it needs to do to complete an investigation of the *Atkins* issue. If the doctors feel like they need to talk to other people, review other records, or do anything else, then we have no problem with that.
>
> Our only concern – the narrow area of dispute before your Honor today in this proceeding – is whether the State can obtain a court order to force Mr. Russell to submit to further testing by State experts, whether that's either appropriate, given the history, or whether it's necessary, given the testing that's already been done, and whether it's fair, given the defendant's rights in preparing and presenting his own case.

Russell's appellate brief also addresses the State's assertion that Russell's 2006 evaluations did not constitute a sufficient basis to reach an *Atkins* determination:

> Dr. Macvaugh's testimony did highlight that there were large areas of work to be completed in his Atkins evaluation in the form of records collection and interview of collateral witnesses. However, none of these required re-testing of Mr. Russell and it is telling that the State chose not to conduct any of these parts of the Atkins evaluation, even after the defense provided records and witness statements in discovery.

Respectfully, my reading of the record shows that Russell never conceded that additional psychological testing by the State was required for his *Atkins* claim.

¶33.    The majority also states that, when the State moved to evaluate Russell for intellectual disability in 2012, it was requesting "*the Atkins* evaluation." Maj. Op. at ¶ 23 (emphasis in original). But the reports from Russell's 2006 psychological evaluations were not rendered meaningless in the *Atkins* context simply because they did not contain conclusions on Russell's intellectual disability.  In fact, one of Dr. Macvaugh's colleagues at the State Hospital testified that sufficient testing had been conducted during those evaluations to offer an opinion on Russell's intellectual disability.  At a pretrial hearing in Russell's assault case, Dr. Reb McMichael, one of the doctors from the State Hospital who had participated in

15

Russell's 2006 evaluations with Dr. Macvaugh, specifically stated that Russell was not intellectually disabled based on that very same testing. On cross-examination, Dr. McMichael testified:

Q:     And he was not subjected to and didn't participate in the full range of testing and assessment that would ordinarily go into an assessment of mental retardation, correct?

A:     Not correct.

Q:     You think you've done everything you would need to do to conduct a mental retardation assessment in this case?

A:     I think that given all of the history that we reviewed in a three-hour interview and in many examples of his ability to understand and use language, I feel that I have adequately assessed whether or not Mr. Russell is mentally retarded.

Thus, the precise question before this Court is not whether Russell's 2006 evaluations constituted a "complete *Atkins* evaluation," but whether the trial court could rely on the results of those evaluations, along with the other evidence before it, to reach a conclusion on Russell's *Atkins* claim without subjecting Russell to further psychological testing.

¶34.    The procedural framework established by this Court in *Chase v. State* requires the petitioner to prove two elements by a preponderance of the evidence in order to succeed on an *Atkins* claim. *Chase*, 873 So. 2d 1013, 1029 (Miss. 2004). First, the defendant must prove that he or she is intellectually disabled, as defined by the American Association for Intellectual and Developmental Disabilities[13] and/or the American Psychiatric Association. *Id.* This element requires proof of three interrelated criteria: (1) significant subaverage

---

[13] At the time *Chase* was decided, this organization was called the American Association on Mental Retardation. *Chase*, 873 So. 2d at 1029.

intellectual functioning ("Criterion A"), (2) significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety ("Criterion B"), and (3) onset before age eighteen ("Criterion C"). *Id.* at 1028 (quoting *Atkins v. Virginia*, 536 U.S. 304, 308 n.3, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002)). And second, the defendant must prove that he or she is not malingering.[14] *Id.* Again, it is the burden of the petitioner, and not the State, to prove each of these elements.

¶35. Proving these elements likely will require the defendant to undergo certain psychological tests, such as IQ tests or achievement tests. *See, e.g., Chase*, 873 So. 2d at 1028 (quoting Diagnostic and Statistical Manual of Mental Disorders 42-43 (4th ed. 2000)) (noting that an IQ score of 75 typically is considered the cutoff score for the intellectual-functioning prong of intellectual disability). But in some cases, and specifically with regard to adaptive functioning under Criterion B, it may not be appropriate to administer any standardized tests to the defendant. For example, in *Thorson v. State*, 76 So. 3d 667, 672 (Miss. 2011), the forensic team at the State Hospital – including Dr. Macvaugh – specifically noted that it had not administered any standardized adaptive-functioning tests to the defendant because "retrospective testing for adaptive functioning is not standardized for use with offenders who have been incarcerated for a number of years." As such, an assessment

---

[14] *Chase* specifically mentioned the Minnesota Multiphasic Personality Inventory-II (MMPI-II) as a test designed to detect malingering, but this Court more recently has clarified that it neither endorses the MMPI-II as the best test nor requires it to be given. *Lynch v. State*, 951 So. 2d 549, 557 (Miss. 2007)

of a defendant's adaptive functioning may include "interviewing family and friends knowledgeable about the defendant's past," "interviews with educators or others in the community familiar with the defendant's behavior before age eighteen," and "a thorough review of school records, social history, and work history, among other things," which may not require direct contact with or testing of the defendant. *Goodin v. State*, 102 So. 3d 1102, 1115 (Miss. 2012).

¶36.    Here, the trial court considered the State's motion to evaluate Russell under Rule 35 of the Mississippi Rules of Civil Procedure, which authorizes the trial court to order an individual to undergo a physical or mental examination if that person's physical or mental condition is "in controversy." Miss. R. Civ. P. 35(a).  An order under Rule 35 "may be made only on motion for good cause shown . . . ." *Id.*  The State does not object to the trial court's reliance on this standard, and the majority does not mention it.  I note, however, that Rule 35 imposes the same good-cause standard as the discovery provision of the Uniform Post-Conviction Collateral Relief Act. *See* Miss. Code Ann. § 99-39-15(1) (Rev. 2015) ("A party may invoke the processes of discovery available under the Mississippi Rules of Civil Procedure . . . if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise."). Applying this standard, we must find that the State had shown good cause justifying additional psychological testing of Russell in order to conclude that the trial court abused its discretion in denying the State's motion. To do so, we must compare the State's two[15] specific requests – intelligence testing

---

[15] The State also alleged that additional malingering testing was necessary.  But Russell was administered malingering instruments in conjunction with his IQ tests in 1989

and adaptive-functioning testing – to the evidence already available to the trial court, keeping in mind the elements that must be proved in an *Atkins* case.

## I. Intellectual Functioning

¶37. This Court has held that a defendant may satisfy Criterion A of the definition of intellectual disability by presenting evidence that he or she has a full-scale IQ score of 75 or lower. *Chase*, 873 So. 2d at 1029. Similarly, the United States Supreme Court recently found that a defendant's IQ score of 74 satisfied Criterion A and required the lower court to "move on to consider [the defendant's] adaptive functioning" under Criterion B. *Moore v. Texas*, 137 S. Ct. 1039, 1049, 197 L. Ed. 2d 416 (2017). *See also Chase*, 873 So. 2d at 1028 (finding that Criterion A may be satisfied by a full-scale IQ score of 75 or below). The *Moore* Court reached this determination based solely on the results of an IQ test administered to the defendant in 1989, even though the defendant's *Atkins* hearing was held in 2014 and the defendant had taken more recent IQ tests. *Id.* Here, Russell presented the trial court with two prior IQ scores, both of which satisfied Criterion A. In 1989, prior to his capital-murder trial, Russell was administered the WAIS-R, and he produced a full-scale score of 68. And in 2006, Russell was administered the WAIS-III by Dr. Macvaugh, and he produced a full-scale score of 75. Dr. Macvaugh testified that the WAIS-III was the "gold standard" IQ test at the time it was administered to Russell. *See also Atkins*, 536 U.S. at 309 n.5 (identifying the WAIS-III as "the standard instrument in the United States for assessing intellectual

---

and 2006, and he was not malingering on either occasion. Because the purpose of a malingering instrument is to ensure the validity of other psychological tests, additional malingering testing would be necessary in this case only if the trial court allowed the State to administer other psychological tests to Russell.

19

functioning"). Accounting for the Flynn Effect, which both of the experts in this case considered a valid statistical adjustment,[16] Russell's scores on those tests would be lowered to 66 and 72, respectively. Thus, the psychological testing already available to the trial court established that Russell satisfied Criterion A.

¶38. The State complains that the trial court could not perform a "complete" *Atkins* evaluation without allowing Dr. Macvaugh to administer the WAIS-IV, the successor to the WAIS-III. To be clear, the WAIS-IV is the *only* specific psychological test Dr. Macvaugh identified as necessary to reach an opinion on Russell's *Atkins* claim. However, Dr. Macvaugh testified that the WAIS-R and the WAIS-III were the most up-to-date IQ tests available at the time they were administered to Russell. In fact, Dr. Macvaugh personally administered the WAIS-III to Russell, and he stated that he did not doubt the validity of Russell's score on that test:

> Q: So you're not saying you need to give him a WAIS-IV because the WAIS-III you already gave him should not be considered a valid estimate of his true intellectual ability.
>
> A: Definitely not saying that, no.

Dr. Macvaugh also testified that Russell's score on the WAIS-III was "certainly among the data points that I would seriously consider in my conceptualization of whether Mr. Russell has mental retardation." This testimony is supported by the reports from Russell's 2006 evaluations, which state that Dr. Macvaugh "explained to Mr. Russell that the results of the intelligence testing could potentially be used to argue whether or not he should receive the

---

[16] Dr. Macvaugh also testified that Russell's score on the WAIS-IV would have to be adjusted to account for the Flynn Effect, if he were ordered to take that test.

20

death penalty." And finally, Dr. Macvaugh opined that, in his experience, individuals usually produce lower scores on the WAIS-IV than the WAIS-III.

¶39. In determining whether good cause existed to order Russell to undergo an additional IQ test administered by the State's expert, the trial court had to consider two existing IQ scores proving that Russell was within the range that satisfied the intellectual-functioning prong of intellectual disability. The State presented no evidence suggesting that those scores were invalid or that they could not be used in an *Atkins* analysis. The only reason offered by the State in support of administering the WAIS-IV was that it was a newer test based on more recent scientific data. But in the State's own expert's opinion, Russell probably would produce a lower score on the WAIS-IV than he did on the WAIS-III. In denying the State's motion for an evaluation, the trial court did not place the State in an "impossible position," as the majority complains. Instead, the trial court correctly weighed the need for additional intelligence testing against the existing evidence of Russell's intellectual functioning, along with the risk of testing error, and determined that the State had not shown good cause to conduct additional testing. Under these facts, I would not find that the trial court abused its discretion in denying the State's request to have its own expert administer the WAIS-IV to Russell.

## II. Adaptive Functioning

¶40. The second requirement for a diagnosis of intellectual disability is "significant limitations in adaptive functioning in at least . . . . two skill areas . . . ." *Chase*, 873 So. 2d at 1021 (quoting *Atkins*, 536 U.S. at 308 n.3). Formal adaptive-functioning tests are not

21

standardized for individuals who have been incarcerated for long periods of time, because they are designed to test an individual's ability to perform certain tasks and live independently outside of the prison community. *See Thorson*, 76 So. 3d at 672. Therefore, as previously mentioned, an evaluation of an *Atkins* defendant's adaptive functioning generally requires an evaluation of other sources of evidence, such as academic records, employment records, and interviews with individuals who knew the defendant prior to age eighteen. *See Goodin*, 102 So. 3d at 1115.

¶41. Here, the trial court had access to the transcript of Russell's three-hour clinical interview at the State Hospital in 2006. Dr. Macvaugh was present for this interview. The interview covered a wide range of topics, including Russell's family history, academic history, employment history, and medical history. The report from this interview clearly states that "information from this evaluation could be used to assist the Court in assessing whether or not [Russell] is mentally retarded and therefore eligible or not eligible for the death penalty." Russell also was administered the WRAT-4, an academic achievement test, in 2006, and he produced scores ranging from third-grade to sixth-grade equivalency, which were consistent with his IQ socres. The WRAT can be used to assess a person's adaptive functioning in the area of functional academics and has been relied on by experts in several previous *Atkins* cases in Mississippi. *See Chase v. State*, 171 So. 3d 463 (Miss. 2015); *Thorson v. State*, 76 So. 3d 667 (Miss. 2011); *Doss v. State*, 19 So. 3d 690 (Miss. 2009); *Spicer v. State*, 973 So. 2d 184 (Miss. 2007). As with the WAIS, the State did not present any evidence suggesting that a WRAT would be administered differently as part of an "*Atkins* evaluation" as opposed

22

to a competency or sanity evaluation. In addition, the WRAT-4 remains the most current version of the WRAT, so the State cannot complain that Russell's scores on the WRAT-4 are "outdated."

¶42.    At the hearing on the State's motion to evaluate Russell, the State began its argument by conceding that "there are no measures for adaptive functioning." Dr. Macvaugh confirmed, "It's difficult to assess an individual's skills using traditional assessment measures, measures designed to assess for adaptive behavior, because the opportunities for a death row inmate to engage in those kinds of behaviors are not available based on what those measurements attempt to measure." Dr. Macvaugh did state that other measures can be used to assess adaptive functioning, such as "interview kinds of tasks, additional kinds of psychometric testing, and review – extensive review of the previous history, especially before age 18." However, aside from the general statement that he "probably also would be administering some kinds of adaptive behavior tasks . . . ," Dr. Macvaugh was unwilling to divulge any specific measure that he would use to evaluate Russell, explaining that he had not determined what types of assessments would need to be administered. Dr. Macvaugh stated that he might administer a money-management subtest of the Independent Living Scales, but as pointed out by the trial court, that test had not been normed for prison inmates, and Russell had been asked numerous questions related to money management during his 2006 interview.

¶43.    In reviewing the State's motion to evaluate Russell, the trial court was tasked with determining whether additional psychological testing of Russell was necessary to reach a

23

conclusion on his adaptive functioning under Criterion B, in light of the existing evidence that was relevant to that issue. Based on Dr. Macvaugh's own admission that standardized adaptive-functioning assessments are not normed for prison inmates like Russell, along with Dr. Macvaugh's refusal to point to any specific test that he would administer to Russell, I would find that the trial court did not abuse its discretion in denying the State's motion to evaluate Russell. Dr. Macvaugh stated that "interview kinds of tasks" can be used to assess adaptive functioning, but Russell had already undergone an extensive clinical interview, and Dr. Macvaugh did not explain why that interview could not be used for the purposes of an adaptive-functioning assessment. Dr. Macvaugh also mentioned that a thorough review of Russell's previous history would be necessary, but such a review would not require psychological testing of Russell. While the majority does not address the substantive issue of Russell's intellectual disability, it is important to note that Russell presented the trial court with his academic records from kindergarten through twelfth grade, along with his scores on several standardized achievement tests. Additionally, Russell's expert witness either interviewed or reviewed the written statements of twenty-three witnesses who had known Russell as a child or young adult, including his family members, classmates, neighbors, teachers, coaches, and co-workers. Dr. Macvaugh acknowledged the importance of this type of evidence to an adaptive-functioning analysis, stating, "we think it's important to attempt to collect collateral data from those types of individuals who knew the individual about whom the assessment is being conducted to collect those types of adaptive behavior data." But the State did not need to subject Russell to psychological testing to gain access to this

24

evidence. Accordingly, I would affirm the trial court's denial of the State's request to evaluate Russell's adaptive functioning.

## CONCLUSION

¶44.    Because the trial court acted within its discretion in finding that the State had not shown good cause to subject Russell to additional psychological testing, I respectfully dissent.  I would affirm the trial court's denial of the State's motion to evaluate Russell.

**KITCHENS, P.J., KING AND COLEMAN, JJ., JOIN THIS OPINION.**